In re Kay Marlene **RANDALL**, Debtor.

**Kay Marlene Randall, Plaintiff,**

**v.**

**Norwest Student Loan Services, Defendant.**

**Bankruptcy No. 99–31723.
Adversary No. 00–7008.**

United States Bankruptcy Court,
D. North Dakota.

Nov. 15, 2000.

---

Anita Ann Flatt, Hawley, MN, Courtney Koebele, Wheeler Wolf Law Firm, Bismarck, ND, for debtor.

## MEMORANDUM AND ORDER

WILLIAM A. HILL, Bankruptcy Judge.

The Debtor, Kay Marlene Randall ("Randall"), by Complaint filed February 2, 2000, seeks a determination that four otherwise nondischargeable student loans totaling $44,943.77 be discharged by reason of undue hardship pursuant to section 523(a)(8)(B) of the United States Bankruptcy Code. Randall, an attorney, bases her assertion of hardship upon her current medical condition diagnosed as chronic pain syndrome and fibromyalgia. Educational Credit Management Corporation ("ECM"), the assignee of the loans at issue, challenges Randall's medical assessment. Trial was held on October 17, 2000. From the evidence presented the Court makes the following findings of fact and conclusions of law.

### Findings of Fact

#### 1.

Randall is a thirty-five year old single woman presently living in Verndale, Minnesota with her fifteen year old son. At the moment she is marginally employed in a church office preparing church bulletins. Her income from this job is supplemented by a variety of welfare assistance programs. Her son, Mitchell, has some health problems but they are not debilitating and at trial he appeared to be a mature, well adjusted young man who is performing well in school despite the family's upheavals. Thus, his situation is not a factor in the Court's consideration.

Randall holds an undergraduate degree in criminal justice from the Minnesota State University at Moorhead, Minnesota, and graduated in 1987 with a 3.29 grade point average. In 1994 she commenced legal studies at the University of North Dakota School of Law receiving her Juris Doctorate in 1997. While in law school she was the recipient of a scholarship, wrote for the law review and successfully completed an internship with a state court judge. She also completed an internship with the United States Air Force JAG Office at the Grand Forks Air Force Base and completed as well, a summer clerkship with the Fargo law firm of Nilles, Hansen & Davies. While in law school she participated in various activities including trial competition for which she received an award. Graduating in the top twenty-five percent of her class, she successfully passed both the North Dakota as well as Minnesota Bar exams on the first try and currently holds licenses in both states. She is also licensed to practice in an Indian tribal court. After brief employment with an East Grand Forks, Minnesota firm, she and her son moved to Surrey, North Dakota, and in January 1998 she commenced employment as an associate attorney with the Minot, North Dakota firm of Olson, Burns & Lee at a salary of $34,000.00 per year. Randall is computer literate and is current in all continuing legal education requirements.

Although in fairly good health during law school, in the fall of 1999 Randall began to complain of headaches and pain of an unspecific nature and found it difficult to continue with the practice of law. In October 1999, she took a leave of absence from the law firm and embarked upon a medical odyssey through various hospitals and clinics. Due to her perceived condition, she did not return to law practice and, without financial resources, moved to Verndale, Minnesota in late February 2000 where for a short time she and her son lived with relatives. Today they live in an apartment and she works but a few days a week for a local church for whom she does typing and assembly of church bulletins. She testified that she gets tired easily, cannot read, cannot see well, and has a hard time concentrating. She continues to complain of pain and an inability to handle stress. She expresses little hope for improvement in her condition.

She and her son subsist on her church wage of $250.00 per month, $324.00 per month from social services, $213.00 per

month in food stamps and $330.00 in monthly child support. Their expenses are minimal consisting of $395.00 per month rent, $40.00 per month phone, $20.00 per month utilities. Medical expenses are for the most part covered by medical assistance. Randall has applied for long-term disability through her former law firm's group policy insurance carrier and has applied for social security disability. So far, she has been turned down for both with the Social Security Administration being of the view that based upon her age, education and work experience and in consideration of her perceived medical condition, she could work.

Randall, however, believes herself disabled placing emphasis upon the opinion of her current treating physician, Dr. Daniel Freeman, M.D., a family practitioner who diagnosed her with fibromyalgia and chronic pain syndrome and who expressed the opinion that she is completely disabled. Dr. Freeman's assessment of hopelessness does not go unchallenged. Dr. Gilbert Westreich, M.D., a board certified neurologist, also examined her and could find no scientific or objective basis for concluding she is under any physical or mental disability. In his view, there is no physical or mental disability preventing her from full-time work as an attorney.

### 2.

#### The Debt

Randall took out four student loans in the course of her law school attendance and in November 1997 consolidated two from Norwest Bank, one from Sallie Mae Service Corporation and one from Graduate Loan Center. The consolidated loan was assigned to Educational Credit Management Corporation who interposed an answer to the Complaint and who is the real party in interest. The outstanding balance is $44,943.77 requiring regular monthly payments of $384.00. In addition to this student loan debt, Randall has other unsecured debts totaling $29,301.00.

### 3.

#### History of Medical Treatment

In evidence are voluminous medical records pertaining to Randall's health, culminating with the recent opinions by Drs. Freeman and Westreich which will be later discussed in detail.

In 1990, Randall, at age 26, was referred to Mayo Clinic complaining of pain and despite a normal neurological exam, was diagnosed with chronic pain syndrome. She returned to Mayo in May of 1993 complaining of fibrosis, spondylolithiasis and pelvic pain. No endometriosis was noted at this time but a therapeutic laparoscopy was performed. As regards to complaint of pain, her symptoms were diagnosed as chronic pain syndrome, etiology undetermined.

With her 1994 law school enrollment, Randall underwent a thorough evaluation by the University of North Dakota Student Health Service. No abnormalities of any bodily systems were found with the only conditions noted being chronic mid-lumbar pain with spondyloithiasis. A chest X-ray revealed no obvious indication of cardiopulmonary disease despite her complaint of heart palpitations. In 1995, she visited the Student Health Service on several occasions complaining of sinus problems, wheezing and coughing, but on each occasion she tested negative for strep. Another chest X-ray in November 1995 revealed a normal chest with no abnormality of heart, lungs or bony structures.

With her move to the Minot area and a new association with the Olson Law Firm, Randall began to feel exhausted and tired. She brought these complaints to Dr. Rebecca Wysoske of Trinity Medical Center in Minot, North Dakota, who noted her as having fatigue, achiness and problems sleeping. Throughout 1998 Randall periodically saw Dr. Wysoske complaining of being tired, having chest pains, feeling anxious, experiencing hot flashes, tremors, tachycardia and fatigue. A complete car-

diology exam was completed in August 1998 including a Holter monitor. The results revealed no evidence of any heart abnormalities and no correlation with her claims of shortness of breath or chest pain. The examining physician, while acknowledging her subjective complaints of feeling hot, of having rapid heart rate and chest pain, concluded that she was normal. In a further effort to find an organic cause for her complaints of palpitations and fatigue, a coronary arteriography was performed in December 1998 and it also revealed no evidence of organic heart disease. She was examined as well for pituitary malfunction but as with the heart, everything was normal.

In March 1999 she was seen complaining of tremors and was seen by a neurologist who diagnosed her as having essential tremors, common migraine and fibromyalgia. Medication was prescribed. Except for the tremors, which Dr. Freeman later testified he has never seen and the cause unknown, the March 1999 neurological exam was unremarkable. Still looking for an organic source of her complaints, a C.T. scan was done of her head and once again everything was normal. An October 1999 examination of her cervical spine showed normal alignment, no degenerative disease and well preserved disc spaces. The examining physician concluded her cervical spine was normal despite her complaints of neck pain. Aside from neck pain complaints, Randall also visited a reproductive endocrinology clinic in Bismarck on several occasions in 1999 complaining of abdominal pain and hot flashes. Upon examination all structures appeared normal except for a benign ovarian cyst and her symptomatology was unexplained. The observed cyst was quickly resolved with birth control pills.

Still persisting in her complaints of pain which by October 1999 seemed to center in her neck, Randall was hospitalized for four days in a Minot hospital. Her complaint now was of increasing right side neck pain coupled with migraine headaches and dou-

ble vision. She also complained of irritable bowel, fibromyalgia and tremors. This time an MRI was done but once again, everything was found to be normal. All body chemistry profile tests including one for Lyme Disease were within normal limits. Her heart was normal and her lungs were clear. No abnormalities of vertebrae were found and no abnormalities of the cervical spinal canal or cord were found. Throughout her hospitalization she required Valium and she was subsequently discharged with prescriptions for Toradol, Demerol, Robaxin, and Flexeril. In sum, according to Dr. Wysoske's discharge summary, the battery of exams disclosed no neurologic defects and no other significant physical findings. It was recommended that Randall undergo a daily course of physical therapy consisting of heat and ultrasound to the neck coupled with massage. This was undertaken and tolerated fairly well but provided little relief for her neck pain. By November 11, 1999, however, considerable signs of improvement were noted. Nonetheless, Dr. Wysoske referred her to the Bismarck Spine & Pain Clinic. There her history was reviewed once again and another examination performed. There the examining physician felt she suffered from chronic pain syndrome and prescribed Prednisone along with ointments for her neck. Now, concerned her complaints might be indicative of multiple sclerosis, Dr. Wysoske referred Randall to Mayo Clinic for a neurological exam. An electromyography of the right upper extremity showed nerve conduction of the right upper extremity and facial nerves to be normal. There was no EMG evidence of any abnormalities and no neurologic cause for complaints of muscle weakness. Once again, body chemistry tests were also performed by Mayo and once again they revealed no apparent abnormalities.

In December 1999 Randall was sent to a pain management center in Minot, North Dakota for further evaluation. There the staff evaluated her as having chronic pain

behavior, depression, relationship issues, financial difficulties, fibromyalgia, substance dependence and a history of unsuccessful medical treatments. The psychology intake report suggested she had pain disorder associated with both psychological factors and a general medical condition. Randall was approved for a three week chronic pain management program and on January 25, 2000, she began her first week in this program where she was introduced to relaxation methods and posture correction. In the second week the progress notes report her as a very complex psychological case but according to the report, she was beginning to recognize the role emotions play in the pain cycle and beginning to recognize her responsibility in pain management. Improvement was further noted in her posture, sleep, mood and attitude. Furthermore, she demonstrated decreased chronic pain behaviors at this time. By the third and final week the notes indicate Randall's ability to relax and reduce tension had improved significantly and she had good insight into pain management.

Shortly after completing the three-week pain management course in February 2000, Randall moved to Verndale, Minnesota where she went to see yet another physician. On March 22, 2000, she was initially seen by Dr. Freeman, a family practitioner in Staples, Minnesota complaining of irrepressible neck pain. His review of her history coupled with an exam confirmed his diagnosis of fibromyalgia and chronic pain syndrome. Over the balance of the year he was seeing Randall on various occasions for the same complaint. In July 2000, he referred her to Abbot Northwestern Hospital in Minneapolis for their fibromyalgia program and there it was noted that she was disabled by fibromyalgia pain and needed a scheduled program of daily relaxation and exercise. Randall continues under the care of Dr. Freeman but on September 9, 2000, she consented to an independent medical exam by Dr. Gilbert Westreich, a specialist in neurology and psychiatry, who performed a standard neurological examination.

Over the course of her many examinations by many physicians Randall has been prescribed drugs which have been commented upon by various physicians, some of whom find it imperative that she be weaned off of them because of drug interactions and unintended side affects. She has taken or is presently taking the following medications: Atenolol, Clonidine, Darvocet, Primidone, Albuterol, Azmacort, Zoloft, Zyrtec, birth control pills, Ultram, Valium, Cyclobenzaprine, Demerol, Tylenol, Neurontin, Diazepam, Flexeril, Prilosec, and Terazol.

4.

### *The Expert Opinions*

By deposition Dr. David Freeman, a family practice physician in Staples, Minnesota, said he began seeing Randall in March 2000 when she was new to the area. Since his initial intake examination he has seen her on several subsequent occasions and continues to treat her. He is familiar with her complaints and her medical history but has not performed any neurological exams on her. In all other respects his examinations have found nothing wrong with her eyesight, hearing, taste, touch or sense of smell. He found her to have normal range of motion, no heart problems or lung problems, except asthma, and no problems with any internal organs. He stated she is able to talk normally and is alert with normal reflexes. As for her continuing complaints of pain, Dr. Freeman is satisfied she has fibromyalgia which he defined as a pain syndrome for which there are no objective tests and which is a condition that some physicians feel is a psychiatric problem. Pain in her case, he said, is entirely subjective and he acknowledged that no one can pinpoint why she is in pain and that her complaints cannot be connected to any objective medical symptom. Dr. Freeman opined that perhaps it may well be that fibromyalgia will eventually turn out to be a neurologic problem. Nonetheless, he is

satisfied the pain is real and limits her ability to perform work principally because, based upon Randall's complaints, the pain interferes with her ability to read and remember. Dr. Freeman, however, has not given her any reading or comprehension tests but thinks this problem may be due to chronic pain. On cross examination he acknowledged that aside from her complaints of reading and remembering difficulties, Randall could work as an attorney even though it might be painful at times. He also said that it is possible her condition could get better but, based upon his experience with other patients, he did not think it likely. Aside from the complaints of pain and reading limitations, Dr. Freeman found no physical restrictions or limitations that would prevent Randall from serving as an attorney.

Also testifying by deposition was Dr. Gilbert Westreich, a board certified neurologist who maintains a private practice as well as doing independent medical exams for insurance companies and defense counsel. On September 7, 2000, he did a standard neurological evaluation of Randall, reviewed her medical history, did a review of her body systems and then did a neurological examination of her peripheral and cervical nervous systems, joints and thyroid. His examinations disclosed nothing abnormal and revealed no evidence of central nervous system disease. He did coordination tests which also were normal. He checked her sensations in arms, legs, and face and all were normal. He could find no evidence of pinched nerves or arthritis. Dr. Westreich provided a report to the Defendant, ECM, stating that in his opinion Randall did not have any neurologic or medical disease causing her symptoms of aches and pains. This report was followed up by another letter to ECM wherein he stated that in his opinion, to a reasonable degree of medical certainty, Randall is not in need of any physical restrictions or limitations and is physically capable of performing full-time work. Testifying further on this point, he said her exam was in all respects normal and he could find no scientific or objective basis for a conclusion that she is under any physical or mental disability.

As did Dr. Freeman, Dr. Westreich also said fibromyalgia is a term used to describe a condition that does not have an objective cause. Where he differs with Dr. Freeman is in the view that fibromyalgia may be neurologic. Westreich said that whether the complaint is fibromyalgia or chronic pain syndrome, the proper person to see is a psychiatrist because, in his opinion, pain without a known organic cause is psychological. After a review of Randall's medical history coupled with his own examination, Dr. Westreich, while not discounting her complaints of pain, was of the opinion that she could work as an attorney.

*Conclusions of Law*

Section 523(a)(8) of the Bankruptcy Code provides:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—
>
> . . .
>
> (8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents;
>
> . . .

11 U.S.C. § 523(a)(8).

■ A debtor seeking such a discharge bears the burden of proving that repayment will impose an "undue hardship." The focus of the foregoing section

is upon the term, "undue hardship" which, while not defined in the Code, has been given contour by case law. In the past, this Court has employed the three pronged *Johnson* test requiring mechanical, good faith, and policy assessments to determine the dischargeability of student loans on the basis of undue hardship. *See Binder v. United States Dept. of Education (In re Binder)*, 54 B.R. 736, 739 (Bankr.D.N.D. 1985). However, the undue hardship test to be employed within the Eighth Circuit may now be characterized as a "totality of the circumstances" test similar to the mechanical analysis required in *In re Johnson*, 5 B.C.D. 532 (Bankr.E.D.Pa.1979). In the Eighth Circuit, the inquiry into the totality of the circumstances places particular attention upon the debtor's current and future financial resources, the necessary reasonable living expenses for the debtor and the debtor's dependents and other relevant facts or circumstances unique to the particular case. *In re Cline*, 248 B.R. 347, 351 (8th Cir. BAP 2000); *In re Andresen*, 232 B.R. 127 (8th Cir. BAP 1999) (citing *Andrews v. South Dakota Student Loan Assistance Corp. (In re Andrews)*, 661 F.2d 702 (8th Cir.1981)). Many courts weighing the question of undue hardship under the totality of circumstances approach have resorted to a list of factors which may serve as a guide. These factors have been recently restated in the case of *In re Morgan*, 247 B.R. 776 (Bankr.E.D.Ark.2000) as the following:

(1) Total incapacity now and in the future to pay one's debts for reasons not within the control of the debtor.

(2) Whether the debtor has made a good faith effort to negotiate a deferment or forebearance of payment.

(3) Whether the hardship will be long term.

(4) Whether the debtor has made payments on the student loan.

(5) Whether there is permanent or long term disability of the debtor.

(6) The ability of the debtor to obtain gainful employment in the area of study.

(7) Whether the debtor has made a good faith effort to maximize income and minimize expenses.

(8) Whether the dominant purpose of the bankruptcy petition was to discharge the student loans.

(9) The ratio of the student loan to the total indebtedness. (citations omitted)

██ Whether one analyzes the circumstances generally or uses the foregoing nine point criteria, the notion of undue hardship has come to be associated with total incapacity both at the time of filing and on into the future to pay one's debts. *In re Jones*, 242 B.R. 321 (Bankr.E.D.Va. 1998). The hardship must be more than mere unpleasantness. This Court has previously held that student loan dischargeability for "undue hardship" must present a certainty of hopelessness and not a mere present inability to meet financial commitments due to a current, temporary state of unemployment. *Erickson v. North Dakota State University (In re Erickson)*, 52 B.R. 154, 158–59 (Bankr.D.N.D.1985). In her brief, Randall cites to this Court's unpublished decision of *Askew v. Bank of North Dakota*, (Adv. No. 99–7015), a case in which student loans were discharged on grounds of undue hardship. Randall would have herself cast in the same mold as Jessica Askew, a thirty-five year old marginally employed single mother with a congenital hip problem and attention deficit disorder. Randall's position is similar in many respects to that of Ms. Askew and many other marginally employed former students. However, her situation is different in one very important aspect. Where Ms. Askew pursued an unfocused course of college study winding up with unmarketable skills, Randall graduated with an undergraduate degree in criminal justice and then went on to distinguish herself in law school by graduating in the upper twenty-five percent of her class. Not only did she obtain good grades but while in law school she benefitted from three rather prestigious internships; with a state judge, the U.S. Air Force, and with one of North

Dakota's top law firms. In the short span of time since her law school graduation, Randall can hardly be characterized as a career failure. Courts are not particularly solicitous of graduate attorneys seeking to discharge their student loans. Illustrative is the case of *Ogren v. United States*, 1996 WL 671356 (Bankr.N.D.Iowa 1996) involving, coincidentally, a University of North Dakota law school graduate who sought a discharge on the grounds of clinical depression. In that case the court, recalling that dischargeability must be based upon a long term certainty of hopelessness, observed that while the debtor certainly was under difficult circumstances, she had a law degree and a variety of job skills and could, despite her depression, perform low stress legal work. *See also In re Vinci*, 232 B.R. 644 (Bankr.E.D.Pa.1999).

■ In the case at bar, the Debtor is only thirty-five years old, has a distinguished legal education as well as other skills which place her in a job market situation quite superior to most including that of Jessica Askew. Nonetheless, after working quite successfully for a Minot firm up until the fall of 1999, Randall would have the Court conclude, based upon her medical situation, that she will never be able to do meaningful professional work again. Her present employment focus is upon the limited minimum wage jobs available in Verndale, Minnesota and while her current economic situation is indeed grim and provides but the barest of necessities for herself and her son, it is by no means certain from the evidence that, possessed as she is with a degree in criminal justice as well as a Juris Doctorate, her situation cannot be expected to improve significantly in the future. She is only thirty-five years of age, in good physical health and has before her at least thirty solid wage earning years.

Hopelessness in Randall's case is premised upon her condition, diagnosed by Drs. Freeman and Westreich, as chronic pain syndrome and fibromyalgia. Both physicians acknowledge her complaints of pain as being real, differing only in the effect those complaints have, with Dr. Freeman saying things will never change and Dr. Westreich saying that regardless of her condition, nothing prevents her employment as an attorney. In the case of *In re O'Brien*, 165 B.R. 456 (Bankr.W.D.Mo. 1994), the court granted a debtor a hardship discharge based upon a diagnosis of chronic fatigue syndrome. In that case, however, the only evidence bearing upon the future course of the condition and its effect upon the debtor was from the debtor herself. The creditor offered no countervailing evidence nor did the creditor object to any of the debtor's testimony. In the case at bar, the opinion of Dr. Freeman, her treating physician, is not only met with the opinion of a neurologist but is also belied by her treatment history. Despite many batteries of tests no one at any of the fine clinics, found anything organically wrong with Randall. All tests have been normal and thus we are left with a debtor claiming an inability to ever work again due to a condition that may, according to Dr. Westreich, be purely psychological. Dr. Westreich, a neurologist, could see nothing that would prevent her from working as an attorney. Indeed, neither could Dr. Freeman, her own physician, who acknowledged that even if she continued to experience chronic pain, she could work as an attorney albeit with some difficulty. Significantly, Randall's complaints of pain began back in 1990 long before she successfully embarked upon the rigors of a legal education. Mayo Clinic diagnosed her with chronic pain syndrome and fibromyalgia in 1993 and yet, according to Randall, she completed law school in three years in fairly good health. By the year 2000, when all of her complaints had finally been boiled down to fibromyalgia and chronic pain syndrome, she attended a chronic pain management program and there, according to the clinicians, she experienced marked improvement in her ability to relax, reduce tension and manage the pain! Later the Abbot Northwestern Hospital recommended a program of relax-

ation and exercise for control of the fibromyalgia. From the testimony of Dr. Westreich coupled with Randall's past history of successfully functioning despite the pain, and positive strides towards its management, the Court does not believe her condition of chronic pain and fibromyalgia is either permanent or hopeless over the long term. While Dr. Freeman is her treating physician, Dr. Westreich is a specialist and performed more tests bearing upon neurology and organic pain. As regards the competing expert opinions on the issue of future employability, the Court accepts Dr. Westreich's view as more credible buttressed as it is by Randall's past experience with pain management. Although her present circumstances when viewed purely from a financial point of view are certainly difficult even to the extreme, they cannot be regarded by the Court as permanent or long term because Randall is not under any permanent or long term physical or mental disability preventing her from significantly changing her financial situation. In sum, Randall has not carried her burden of proof on the issue of "undue hardship." The Court does not believe her condition, while perhaps uncomfortable, is either permanent or so disabling as to prevent her from seeking and obtaining gainful professional employment as an attorney.

Accordingly and for the reasons stated, this Court concludes that the Debtor has failed to carry her burden of proof on the issue of undue hardship pursuant to section 523(a)(8)(B) of the United States Bankruptcy Code and thus, the remaining indebtedness outstanding and owing to the Defendant Educational Credit Management Corporation, the assignee of the loans at issue, is nondischargeable.

**JUDGMENT MAY BE ENTERED ACCORDINGLY.**

**SO ORDERED.**