In re Kevin C. OSWALT, Debtor.

Kevin C. OSWALT, Plaintiff,

v.

UNIVERSITY AT BUFFALO, Loan Servicing Center/P.A., USA Funds, Sallie Mae, Key Bank of New York, Federal Perkins Loan Program, U.S. Department of Education, and New York State Higher Education Service Corporation, Defendants.

Bankruptcy No. 93–13645.
Adversary No. 97–1066.

United States Bankruptcy Court,
W.D. New York.

Nov. 17, 1997.

Regina A. Reitz, Jeffrey Freedman Attorneys, Buffalo, NY, for Plaintiff.

Raymond C. Stilwell, Rochester, NY, for USA Funds.

Barry S. Weinstein, Albany, NY, for NYSHESC.

## DECISION AFTER TRIAL

MICHAEL J. KAPLAN, Chief Judge.

· The Debtor, Kevin C. Oswalt, filed this adversary proceeding in order to have his student loan debt declared dischargeable under 11 U.S.C. § 523(a)(8)(B). He claims it would impose an "undue hardship" if these debts were not discharged. This case was tried before the Court on October 17, 1997. The facts and circumstances revealed to the Court presented a very close, and therefore instructive, case of "undue hardship." · This Court finds that the Debtor has made a showing sufficient to warrant discharge of his student loan debt under 11 U.S.C. § 523(a)(8)(B). The facts are as follows:

### FACTS

1. Kevin C. Oswalt (the "Mr. Oswalt" or "Debtor") is thirty .one years old, he is single, and he has no children.

2. A large portion of Mr. Oswalt's debt arose from student loans. He currently owes to New York State Higher Education Services Corp. ("NYSHESC") approximately $15,950.95 on account of guaranteed student loans taken between 1985 and 1993. He also owes approximately $1,702.69 to the State University of New York at Buffalo ("UB"), and $6,254.93 to USA Funds, on account of student loan debt incurred within about the same time period.

3. The Debtor has taken advantage of various deferments and forbearances from these lenders. Repayment on the NYSHESC loans was deferred from 7/28/91 through 8/25/91, 8/26/91 through 2/2/92, and 9/24/92 through 2/28/93. See Partial Stipulation of Facts, ¶ 8. Repayment on one of the UB loans was deferred from 1/90 through 12/90, and 8/91 through 5/92; another UB loan was deferred from 10/90 through 12/90, and 9/91 through 5/92. See Stipulation between UB and Debtor, ¶ 2–3.

4. These loans have been matured for less than 7 years and therefore, are not dischargeable under 11 U.S.C. § 523(a)(8)(A).

5. The Debtor began his college studies at UB in the Fall of 1985. He spent one semester, Fall 1989, at Arizona State, and took his last college level class at UB in the Spring of 1993. He started with a focus in Physics, switched to Engineering, and finally in Spring of 1992, switched focus again to Health and Human Services. In 13 semesters, and 5 summers, he completed a total of 129.5 credits at UB, and in his semester at Arizona State withdrew from four out of five classes, and failed the fifth.

6. The Debtor did not receive a bachelor's degree, an associate's degree or a certificate on account of his 129.5 college credits.

These credits are about half of those needed for a bachelor's degree.

7. The reason for not completing his education was that during the course of his college career the Debtor found it increasingly difficult to concentrate and retain information; he was depressed and experienced anxiety attacks. As a result, he withdrew from many of his classes, rather than receive a failing grade. Of the classes the Debtor was able to complete, he maintained about a C average.

8. The Debtor first sought psychiatric counseling in June of 1988, and suffered an anxiety attack while in Arizona. His afflictions became most severe in the Spring of 1993, when the Debtor withdrew from all of his classes at UB, and ultimately did not return to college.

9. The Debtor's treatment program at Horizon Human Services ("Horizon") involved one-on-one counseling once a week (later once every two weeks), and psychiatric counseling once a month; he also was taking the prescription antidepressant drug, Zoloft.

10. Documentation from Horizon noted that the Debtor had problems with excessive sleep, low energy, lack of motivation, inability to concentrate, poor self esteem and confusion about career choice. Plaintiff's Ex. # 4.

11. Through his testimony, the Debtor described an anxiety disorder which was caused by stress or pressure from school and/or work, and which was alleviated by removing himself from such stressful environments.

12. In August of 1996, three years after leaving college, the Debtor terminated his treatment with Horizon because he felt that he had "reached his goals." He is no longer taking medication for his psychiatric problems, nor is he receiving treatment.

13. Fear as to his psychological ability to succeed, as well as lack of finds, caused the Debtor not to seek to complete his college education.

14. The Debtor's student loan payments first became due in 1993, and he estimates that he repaid approximately $1,200.

15. The Debtor currently works at a NOCO Express shop, and has worked there for almost two years. He is paid $5.75 per hour and works approximately 40–45 hours per week. His average net income is roughly $210.00 per week [1] because he usually is able to work overtime. Starting this month, NOCO will be deducting $6.90 per week from his paycheck for health insurance, so his average weekly take home should be about $203, or about $812 per month.

16. In addition to his current full time work at NOCO, the Debtor volunteers his time with a crisis services hotline. He usually works two, four hour daytime shifts per week, and, if the shift is available, he works an additional eight hours for a $38 stipend. He tries to earn this stipend whenever the shift is available to him.

17. Assuming the Debtor is able to get this shift every week, his work at the crisis hotline would bring his monthly take home pay up to $964.

18. The Debtor has no other income, and does not receive assistance from any other source.

19. The Debtor's monthly expenses add up to about $979.00. They are as follows:

| | | | |
|---|---|---|---|
| Electric | $ 75 | Recreation | $ 50 |
| Personal care | $ 20 | Food | $200 [2] |
| Telephone | $ 25 | Clothing | $ 50 |
| JCPenney | $ 30 [3] | Laundry | $ 25 |
| Capital One | $ 12 | Transportation | $175 |
| Rent | $275 | Medical | $ 10 |
| Insurance | $ 32 | | |

20. Prior to working at NOCO, the Debtor worked at National Airport Parking for about 9 months where he parked cars and

---

1. The Debtor introduced pay stubs from the 6 weeks preceding trial which show a range of net pay from $125 to $221. Plaintiff's Ex. # 2. NYSHESC introduced pay stubs from a different time period which indicated a higher average take home pay. The Court has averaged the pay stubs introduced by the Debtor and NYSHESC to come up with the $210 average weekly take home pay.

2. Although the Debtor's Schedule J budgets food at $100 per month, the Debtor testified that that has proven to be unrealistic and in reality he spends more like $200 per month.

3. The Debtor is paying off balances of $120 and $406 respectively. (These were either postpetition debts or reaffirmed debts.)

drove a shuttle to the airport; he earned $5.50 per hour and worked about 32 to 40 hours per week. The Debtor worked at NOCO for about 2 years before going to National; he earned a similar salary and worked about the same number of hours.[4]

21. In searching for jobs, the Debtor visited, on more than one occasion, the career services division of Jewish Family Services. He did not use UB career services because of his outstanding tuition bill.

22. He attended a training program to become a home health aid, but did not follow through because: (1) the hours were too few (although the pay was higher, $7.00, he was only offered 6 hours of work per week); (2) he found himself becoming depressed; (3) and he had suffered a knee injury (a knee dislocation in 1995) which prevented him from performing some of the physical activity which would be required by such an occupation.

23. The Debtor also declined a job as a wheel chair van driver because of similar physical and mental limitations.

24. In the summer of 1996, the Debtor applied for a telemarketing job but was not offered a position.

25. The Debtor owns a 12 inch color television; he does not own a VCR, stereo or computer. He describes his household furnishings as in "usable" condition; he owns a 1986 Chevrolet Cavalier with 179,000 miles on it, which needs a new exhaust system, burns oil and uses an excessive quantity of gasoline.

26. The Debtor hopes to buy another, more reliable car soon; he will take on a second part-time job in order to pay for the car.

27. Before resorting to bankruptcy, the Debtor did seek consumer credit counseling, but was not satisfied that the counseling they offered would help his situation, since virtually all his debt was student loan debt which counseling could not fully address.

28. In 1993, the Debtor filed a petition under Chapter 13, and he has since completed a plan whereby he paid $80 per month for about 3 years and has repaid about 5% of his debt.

## DISCUSSION

■ The Second Circuit in *Brunner v. New York State Higher Education Services,* 831 F.2d 395 (2d Cir.1987), set forth the standard for "undue hardship" as a three part test. Under that test, the debtor must show:

> (1) that [he] cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that [he] has made good faith efforts to repay the loans.

*Brunner,* 831 F.2d at 396.

■ The Court finds that under the totality of a number of circumstances, the second and third prongs of *Brunner* have been met.[5] These circumstances are the following: (1) the Debtor made some significant prepetition payments and utilized some deferments; (2) despite little debts other than the student loans, the Debtor filed Chapter 13, not Chapter 7; (3) the Debtor completed a three year Chapter 13 plan under this Court's protective umbrella before seeking to discharge these debts[6]; (4) the Debtor lives alone and lives an austere life; (5) based on his skills, training, education and physical and mental condition, the Debtor is fully employed, working more than forty hours per week at a NOCO Express shop, and as a crisis hot line worker; also he intends to seek a second part-time job to finance a replacement for his 1986

---

4. For the last 2 or 3 months of his first job at NOCO the Debtor was promoted to assistant manager and earned $6.25 per hour, but he was fired when a "sting" caught him selling alcohol to a minor.

5. That the first prong has been met is not seriously contested.

6. See *Kraft v. New York State Higher Education Services Corp. (In re Kraft),* 161 B.R. 82 (Bankr. W.D.N.Y.1993). In *Kraft,* this Court held that the debtor could not demonstrate "good faith" when she filed a § 523(a)(8)(B) complaint without giving her "life after discharge" a chance. *Id.* at 86.

Chevrolet Cavalier; (6) the Debtor's failure to complete a curriculum that would have given him greater income opportunities was not a matter of free choice, but was the result of a documented anxiety disorder; (7) the Debtor's seeming acceptance of his present "lot" in life seems sincere; he believes that he is doing as well as he can expect without a degree; he knows he cannot afford to return to school to obtain a degree and fears, based on past experience, that he would not succeed; (8) although only a three year plan, the Chapter 13 plan was a "struggle" and was his best "effort"; and (9) the Court is convinced that he is hard-working, well-intentioned and frugal (he has never had significant other debt; he does not own a VCR, stereo or late-model car).

Based on the foregoing, the Court finds that the Debtor's current state of affairs is "likely to persist for a significant portion of the repayment period," that the Debtor has made a good faith effort to repay the loans, and that the Debtor is only maintaining a "minimal" standard of living based on his current income and expenses. *See Brunner*, 831 F.2d at 396.

In addition, this writer feels that this case is not what Congress had in mind in 1978 when it barely decided not to abolish the student loan exception to discharge and re-enacted provisions intended to prevent "abuse." [7] There is no abuse here; rather as defined by *Brunner*, there would be "undue hardship" here were the loans not discharged.[8]

Judgment shall be entered for the Plaintiff, discharging the higher education debts.

SO ORDERED.

---

**7.** H.R.Rep. No. 95–595, at 132–34 (1977), *reprinted in* 9 Bankr.L.Ed. § 82:4, at 109–111 (1979). Under the Bankruptcy Act, educational loans were not excepted from discharge. The House Report notes that "a few serious abuses of the bankruptcy laws by debtors with large amounts of educational loans, few other debts, and well-paying jobs, who have filed bankruptcy shortly after leaving school and before any loans became due, have generated movement for an

exception to discharge." 9 Bankr.L.Ed. § 82.4, at 110.

**8.** NYSHESC's argument that there should be a "certainty of hopelessness," *see Mathews v. Higher Education Assistance Foundation, et al (In re Mathews,)*, 166 B.R. 940 (Bankr.D.Kan.1994), before granting a § 523(a)(8) discharge already has been rejected by this Court. *See Kraft*, 161 B.R. at 84 n. 2.