In re James E. STERN, Debtor.

James E. Stern, Plaintiff,

v.

The Education Resources Institute Inc. & American Student Assistance, Defendants.

Bankruptcy No. 01–64025.
Adversary No. 02–80040.

United States Bankruptcy Court, N.D. New York.

Dec. 27, 2002.

Carl Worboys, Liverpool, NY, for Debtor.

Whiteman, Osterman & Hanna, Albany, NY, Attorneys for Educational Credit Mgt. Corp., John J. Henry, Of Counsel.

Buchanan Ingersoll, P.C., Buffalo, NY, Attorneys for The Education Resources

Institute, Christopher P. Schueller, Of Counsel.

## MEMORANDUM–DECISION, FINDINGS OF FACT, CONCLUSIONS OF LAW AND ORDER

STEPHEN D. GERLING, Chief Judge.

Before this Court is an adversary proceeding commenced on February 25, 2002, by James E. Stern ("Debtor") by the filing of a complaint against The Education Resources Institute Inc. ("TERI") and Educational Credit Management Corporation ("ECMC"), as assignee of American Student Assistance ("ASA"),[1] (collectively "Defendants") seeking a discharge of student loans of the Debtor pursuant to § 523(a)(8) of the Bankruptcy Code, 11 U.S.C. §§ 101–1330 ("Code"). Issue was joined by the filing of an answer on behalf of ECMC on March 12, 2002, and on behalf of TERI on March 20, 2002.

A trial was held in Utica, New York, on July 22, 2002. Following the trial, the Court reserved its decision and granted the parties the opportunity to file additional memorandum of law by August 30, 2002.

### JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1134(b), 157(a), (b)(1), and (b)(2)(I).

### FACTS

The Debtor filed a voluntary petition seeking relief pursuant to Chapter 7 of the Code on June 22, 2001. At the time of the trial, Debtor was thirty-five years of age and was married to Farah Stearn, a thirty year old French woman. They have no

---

1. Although American Student Assistance Corporation was named as the defendant, it was ECMC which appeared before the Court at the trial. See ASA/ECMC's Exhibit 2 (Assignment of Claim, dated July 3, 2001).

children. (Tr. 108). At the time of trial, the couple was residing in France.

*Educational History*

Debtor matriculated at Bates College in Lewiston, Maine in 1984. (Tr. 65 and 112). He graduated in 1988 with a joint interdisciplinary major of philosophy, psychology and anthropology. In 1990, Debtor entered Syracuse University College of Law as a full-time student, graduating with a Juris Doctorate in 1993. (Tr. 122). He passed the New York State Bar examination and was admitted to practice in New York on February 14, 1994. (Tr. 70).

*Employment History*

The Debtor worked as a psychiatric technical worker for Frye County Mental Health in Lewiston, Maine, subsequent to his graduation from Bates College (Tr. 66). After a year, he moved to Massachusetts and worked at a day treatment facility in Lynn, Massachusetts, for approximately a year, before entering law school. ( Tr. 67). After graduating from Syracuse University College of Law, the Debtor had difficulty finding employment. (Tr. 70). Prior to admission to the New York State Bar, he attempted to start a technology consulting business without success. (Tr. 71). Eventually, the Debtor opened his own law practice in Syracuse, New York. (Tr. 72). He remained a solo practitioner from 1995 until 2001, specializing in civil rights, and supplementing his income by handling criminal defense work and cases for the Teamsters Legal Benefit Panel and assigned counsel program. (Tr. 83, 92).

According to the Debtor's tax returns, his annual business income from 1995—2000 amounted to $11,500, $11,700, $12,831, $16,965, $17,183, and $33,774, respectively. *See* Debtor's Exhibit C. According to the 2001 tax return, there was also income of $14,430 identified as being from rental real estate, royalties, partnerships, etc. *Id.* It appears that between 1996 and 2001, Debtor's wife earned annually $5,722, $15,896, $8,606, $19,145, $25,829 and $32,666, respectively.

Although successful in defending two malpractice claims filed against him, the Debtor's malpractice insurance increased in 2001 to a level that he was unable to afford as a solo practitioner. (Tr. 95) *See* Debtor's Exhibit J. Without malpractice insurance, he was unable to participate in certain programs, such as the Teamsters Legal Benefit Panel. There was no evidence presented to indicate that the Debtor ever sought employment with any law firms in Syracuse or elsewhere that arguably would have provided him with malpractice coverage. As a result of his inability to obtain affordable malpractice insurance and the resultant decrease in earnings, he decided to close his practice in July 2001 and in August 2001 he and his wife moved to France to be with her father, who had suffered a stroke.

Debtor testified that in France he was not even qualified to be a street sweeper because of his inability to speak the language. (Tr. 100). According to the Debtor, he is now taking classes to learn to speak the language. In the interim, he has been collecting residual income from his prior law practice of approximately $2,000.00 per month. He testified that he expects that income will cease in the near future. (Tr. 154). It was his testimony that although he had not made inquiry, he did not believe he would be able to get a position as a lawyer in either the government or the private sector because of his debt and his history of default on his student loans. (Tr. 105–106). He testified that he intended to allow his license to lapse as he no longer had an interest in pursuing a legal career. (Tr. 148).

*Student Loan History*

The Debtor took out loans for both his undergraduate and graduate education.

(Tr. 65–66). He began repayment of his undergraduate student loans after graduating from Bates College in 1988 and continued to repay them until he matriculated at Syracuse University College of Law. (Tr. 65 and 69). The Debtor took out additional student loans to pay for his legal education. (*Id.*) Upon graduation from law school, the Debtor acknowledged having difficulty maintaining the repayment schedule of his student loans. (Tr. 73). He testified that in 1995 he entered into two consolidated loan programs that lowered his monthly payments in an effort to remain current on his loan payments.[2] (Tr. 77). Despite the lower monthly student loan payments, the Debtor was unable to make the payments and defaulted. (Tr. 76, 79 and 80). However, even after defaulting, the Debtor continued to make some payments on the loans. (Tr. 81–82). He eventually sought the advice of fellow attorney and friend, Samuel C. Young, Esq., who referred him to counsel that specialized in bankruptcy. (Tr. 54).

In his petition, he lists a debt of $105,480.16 as being owed to ASA and an additional $36,373.56 as being owed to The Graduate Loan Center or TERI.[3],[4] According to ASA/ECMC's documentation, the actual total consolidated loan amount as of approximately May 24, 1995, was $146,294.28, which includes $55,708.77 in principal and $90,585.51 in interest. *See* ASA/ECMS's Exhibit 1. According to the affidavit of one of ECMC's employees, Tamara Tonn, the principal balance as of July 15, 2002, was $73,112.44 and interest and collection costs totaled $41,813.70, for a total amount of $114,926.14. *See* ASA/ECMC's Exhibit 14.[5] According to TERI's documentation, its loan as of approximately February 7, 1997, was $76,573.56, including $30,647.44 in principal and $45,926.12 in interest. *See* TERI's Exhibit 1.

According to the Debtor's records, he has paid a total of $26,734.06 to the Defendants, beginning April 15, 1995 and ending May 24, 2001. *See* Debtor's Exhibit A.

*Personal History*

The Debtor testified that he had become depressed and had experienced a high level of stress due to concern with his financial situation. (Tr. 88). He was counseled by David Gandino ("Gandino"), a certified psychiatric social worker, beginning in June or July of 2000. Gandino diagnosed Debtor as having an "adjustment reaction with mixed emotional features" resulting from stress. (Tr. 41). However, Gandino felt that his condition was not disabling. (Tr. 41, 43 and 46). Indeed, the Debtor testified that he does not believe that either he or his wife suffer from any disability. (Tr. 108).

In December 2000 the Debtor's parents' jewelry business was robbed. His parents' health deteriorated after the robbery. (Tr. 42–43). The Debtor had difficulty dealing with the fact that the individuals

---

2. According to the documents presented, it appears that he actually consolidated one set of loans on May 24, 1995, and another on February 7, 1997. *See* ASA/ECMC's Exhibit 1 and TERI's Exhibit 2, respectively.

3. On or about February 16, 1999, the Graduate Loan Center assigned its right title and interest in the consolidated note signed by the Debtor on February 7, 1997, in the amount of $30,344, to TERI. *See* TERI's Exhibit 2.

4. The only other unsecured debt listed by the Debtor is $33,000 of "Yellow Page Advertising" incurred in 1996. Debtor identifies no secured or priority debt in his schedules.

5. The parties stipulated to the admission of ACS/ECMC's Exhibit 14, as well as TERI's Exhibits 1, 2 and 3 with the caveat that they were being admitted for the "Court's informational purposes, not to fix the actual amount of the debt[ ]." (Tr. 5, 7).

who robbed his father's store were the same type of individuals he had spent time defending in some instances. He found that he was very angry with clients accused of committing violent crimes, and he was no longer able to defend such individuals. As a result of the decision to limit his practice in this manner, he experienced a decrease in income which, along with his difficulty in obtaining affordable malpractice insurance, caused him to close his law practice in July 2001 and moved to France the following month.

The Debtor testified on cross-examination that he and his wife intended to remain in France for at least five years. (Tr. 147). He acknowledged that their expenses had increased in certain areas since moving to France. He testified that gas is four times as expensive and food is also expensive. (Tr. 141). He also indicated that housing and the cost of an automobile is also more expensive in France. (Tr. 142). According to the Debtor, such things as health insurance were less expensive.

According to Schedule J, filed with his Petition in June 2001, his monthly expenses totaled $1,870, exclusive of any payments on his student loans. This included $550 in rent, $175 in utilities, including telephone, $300 for food, $150 for clothing, $50 for laundry, $50 for medical and dental, $100 for transportation, $50 in recreation and $395 for insurance. *See* ASA/ECMC's Exhibit 3. His current monthly expenses total $2,155. *See* Debtor's Exhibit G. He estimates monthly amounts of $450 for rent, $200 for utilities, $300 in transportation costs, $125 for insurance, $400 for food, $50 for clothing, $20 for medical and dental, $150 in recreation, $10 for household goods and maintenance, $250 [6] in travel expenses and $200 in other expenses. *See id.*

*Spouse Information*

The Debtor's wife, Farah Stearn, was born in France and is just a few courses shy of a masters degree from the University of Nance, France. (Tr. 109). Prior to graduating from the masters program, she met and married the Debtor in 1996. (*Id.*). She holds an undergraduate degree in teaching of the English language at an elementary level. (*Id.*). Prior to moving back to France, she had been employed as an English and Spanish teacher at an inner city school in Syracuse, New York, where she had earned an annual salary of $34,000.00.[7] (Tr. 110–11). She is currently freelancing as an English teacher in France but as yet has been unable to obtain full-time employment. Debtor calculated that she had earned approximately $2,200 between January and June 2002. (Tr. 149).

### ARGUMENTS

Debtor argues that his current financial circumstances warrant a discharge of his student loan debt pursuant to Code § 523(a)(8). Specifically, the Debtor contends that "I'm never going to be able to get a house, I'm never going to be able to have a car, and I won't—you know, I want to have kids. I want to be responsible, and I can't—I can't possibly pay this amount and have a life, not with what I expect I'll be able to earn." (Tr. 104–105). He argues that amortization of a nearly $150,000.00 debt over 50 years, accruing at least eight percent interest per year,

---

**6.** At the trial, the Debtor acknowledged having spent approximately $2,300 for travel to and from the United States since moving to France, a period of approximately one year. (Tr. 146).

**7.** According to the Debtors' 2001 income tax returns, she earned $32,666 in 2001. (Tr. 151).

would require him to pay approximately $14,000.00 per year over a fifty year period. *See* Debtor's Trial Brief in Support of Complaint to Determine Discharge of Debt at 5 and 8. The Debtor contends that it would be impossible to make those payments without imposing undue hardship upon him. *Id.* Additionally, the Debtor takes the position that he is unemployable in the legal profession due to his inability to afford adequate malpractice insurance coverage. (Tr. 105). It is the Debtor's position, citing to Scott Pashman, *Discharge of Student Loan Debt under 11 U.S.C. § 523(a)(8): Reassessing "Undue Hardship" after the Elimination of the Seven–Year Exception,* 44 N.Y.L. Sch. L. Rev. 605 (2001), that with the revision of Code § 523(a)(8) in 1998 and the elimination of the provision which allowed the discharge of student loans if they had become due more than seven years before the date of the filing of the petition, the standard set forth in *Brunner v. New York State Higher Educ. Services Corp.,* 831 F.2d 395, 396 (2d Cir.1987), should be reassessed and lowered, giving the term "undue hardship" a broader interpretation.

Defendants, however, argue that Debtor's circumstances fail to meet the three-prong test announced by the Second Circuit in *Brunner.* They point out that the Debtor has not pursued all his employment options. Neither he nor his wife have any physical or mental disabilities. They have no other dependents. The Debtor is bright and articulate with useable job skills with which to earn sufficient income to repay his student loans without undue hardship. TERI also asserts that the Debtor has not exhausted his contractual and statutory remedies which might provide him with a reduced payment schedule or the possibility of deferment given his present situation.

## DISCUSSION

Code § 523(a)(8) is applicable to loans "made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution . . . ." 11 U.S.C. § 523(a)(8). There appears to be no dispute among the parties that the loans obtained by the Debtor in this case fall within the parameters of the statute. Congress, in enacting the statute, was cognizant of the fact that

educational loans are different from most loans. They are made without business considerations, without security, without cosigners, and rely [ ] for repayment solely on the debtor's future increased income resulting from the education. In this sense, the loan is viewed as a mortgage on the debtor's future.

H.R.Rep. No. 595, 95th Cong., 1st Sess. 133 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5787, 6094.

The Second Circuit Court of Appeals in *Brunner* established a three-prong test for a debtor seeking an undue hardship discharge under Code § 523(a)(8). The Debtor must prove

"(1) that the debtor cannot maintain, based on current income and expenses, a 'minimal' standard of living for [himself] and [his] dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and (3) that the debtor has made good faith efforts to repay the loans."

*Brunner,* 831 F.2d at 396. Furthermore, all prongs of the three-prong "undue hardship" test must be met in order for the debt to be discharged. *See id.* If the Debtor fails to prove one of the *Brunner* elements, the Debtor's educational loans

cannot be discharged. *See Wetzel v. New York State Higher Educ. Services Corp. (In re Wetzel)*, 213 B.R. 220, 225 (Bankr. N.D.N.Y.1996).

As noted by the Third Circuit Court of Appeals in applying the *Brunner* test,

the *Brunner* standard safeguards the financial integrity of the student loan program by not permitting debtors who have obtained the substantial benefits of an education funded by taxpayer dollars to dismiss their obligation merely because repayment of the borrowed funds would require some major personal and financial sacrifices.

*Pennsylvania Higher Educ. Assistance Agency v. Faish (In re Faish)*, 72 F.3d 298, 305–306 (3d Cir.1995).

*Minimum and Maximum Analysis*

The first prong of the *Brunner* test requires the Court to examine whether the Debtor has demonstrated, based on his current income and expenses, that he cannot maintain a minimal standard of living for his family and repay his educational loans. *Brunner*, 831 F.2d at 396. It is clear from the evidence and testimony elicited at the trial that the Debtor is presently struggling financially. He testified that he has been unable to obtain full-time employment and has been depending on residuals from his prior law practice, which over the past year averaged approximately $2,000 per month. It was his testimony that he expected them to cease in the near future. He also testified that his wife had not as yet been able to find full-time employment and had earned approximately $2,200 over the first six months of 2002. Their current expenses, without any payments on the student loans, total approximately $2,155. The Court concludes that the Debtor's current income prevents him from repaying his student loans at this time.

*Duration of Inability to Repay Loans*

■ The second prong of the *Brunner* test requires that the Debtor prove more than his present inability to pay his student loan obligations. *Brunner*, 831 F.2d at 396. He must also establish that his current financial hardship is likely to be long-term. *Id.* "This factor properly takes into account the nature of education as a long term investment that may not pay dividends for years to come." *In re Vinci*, 232 B.R. 644, 652 (Bankr.E.D.Pa.1999); *see also Briscoe v. Bank of New York (In re Briscoe)*, 16 B.R. 128, 131 (Bankr. S.D.N.Y.1981) (indicating that the dischargeability of student loans is "based upon the certainty of hopelessness, not simply a present inability to fulfill financial commitment."). What is important is for the Court to consider whether there are "unique" and "exceptional" circumstances, beyond the reasonable control of the Debtor, that would prevent future employment and the ability to repay the debt.

■ In this case, the Debtor possesses both a bachelor's degree and a Juris Doctorate. While unable to gain full-time employment since quitting his law practice in Syracuse and moving to France, it is evident to the Court that he is bright, articulate, well educated and suffers from neither physical nor mental disability that would prevent him from earning a living in the future which would permit him to repay his student loans. The Debtor apparently has decided that he is no longer wishes to pursue a legal career. He is certainly well within his rights to make such a choice. Nevertheless, as noted by the court in *Vinci*, "[t]he Debtor has apparently taken the position that she is absolved from paying her legal education loans if she is not gainfully employed as a lawyer. This is not the standard. Borrowers under the various guaranteed student loan programs are obligated to repay

their loans even if they are unable to obtain employment in their chosen field of study." *Vinci,* 232 B.R. at 652–53; *see also Wetzel,* 213 B.R. at 226 (indicating that "[a]n education bestows knowledge and opportunity, and not necessarily a specific employment."); *In re Perry,* 239 B.R. 801, 809–810 (Bankr.W.D.Ark.1999) (citations omitted) (noting that the debtor's commitment to social issues and her sincerity in choosing to represent indigents and poor working-class people, while laudable, did not serve as a basis for discharging her obligations on her student loans). The Debtor has failed to convince the Court that factors exist beyond his reasonable control that would prevent him from improving his financial situation. Accordingly, the Court concludes that the Debtor has failed to meet his burden of proof with respect to the second prong of the *Brunner* test.

*Good Faith*

Because the Court has determined that the Debtor has failed to meet his burden of proof with respect to the second prong, it need not address whether the Debtor made a good faith effort to repay his student loans in reaching the conclusion that the Debtor is not entitled to a full discharge of his student loan obligations pursuant to Code § 523(a)(8).

■■■ Although not specifically requested in the complaint, the Court also deems it appropriate to address the question of whether, based on the evidence presented, the Debtor is entitled to a partial discharge pursuant to Code § 105[8] to the extent that "it would be an undue hardship for that part of the loan obligation not to be discharged." *In re Mort,* 272 B.R. 181, 185 (W.D.Va.2002). As the

court in *Mort* noted, such an analysis begins with a good faith inquiry in which the court " 'looks to see whether the debtor has tried to repay his student loan obligations since they were incurred, has made efforts to renegotiate the loans, to obtain deferments, and to minimize expenses and increase income.' " *Id.,* quoting *East v. Educ. Credit Mgmt. Corp. (In re East),* 270 B.R. 485, 495 (Bankr.E.D.Cal.2001).

It is clear from the testimony presented at the trial that the Debtor made an effort to repay his student loans beginning in 1995 through May 2001, which was approximately a month before he discontinued his law practice. According to the Debtor's records, over that period he has paid approximately $26,734 on loans totaling in excess of $85,000 in principal. According to ASA/ECMC's representative, a total of $9,198.67 has been paid on its loans. *See* ASA/ECMS's Exhibit 14 and ¶¶ 4–5. This leaves an estimated $17,536 having been paid to TERI if the Debtor's figures are correct. The percentage of his income allocated to those repayments ranged from 35% in 1995 to 7% in 2001. *See* Debtor's Exhibit C.

The second factor to be considered is whether the Debtor has taken advantage of available options to increase the affordability of his student loan debt, including pursuing such alternatives as deferment, forbearance, cancellation of extended, graduated, income-contingent and income-sensitive repayment options. The record indicates that he did consolidate his loans both in 1995 and 1997. However, nothing in the evidence presented at trial indicates that he has made any further attempts to inquire as to any contractual or statutory remedies that might be available to him

8. "A majority of courts have held that bankruptcy courts are empowered to partially discharge a debtor's student loan by virtue of 11 U.S.C. § 105." *In re Kapinos,* 243 B.R. 271, 276 (W.D.Va.2000) (citation omitted).

and which would permit either a reasonable deferment or perhaps a reduced payment schedule until he is able to gain lucrative employment.

The Court also finds disturbing the Debtor's failure to maximize his income and minimize his expenses. He and his wife have elected to relocate to France where the Debtor admitted that the cost of living is higher. According to his current budget of expenses, he incurs approximately $250 per month in additional travel expenses between France and the United States. These do not reflect an effort after June or July 2001 on the part of the Debtor to minimize his expenses. Nor is there any evidence that he ever made any effort to obtain employment in the United States in order to enhance his earnings, whether it be in business, government or in a private law firm in Syracuse or elsewhere. Instead, he opted to move to a country where he acknowledges he cannot even get a job as a street sweeper because of his inability to speak the language.

The Debtor presented calculations which indicate that his monthly payment on principal of $145,000 at 9% annual interest would be approximately $1,167 per month over 30 years. *See* Debtor's Exhibit H. Obviously, the Debtor would prefer to be in a position that would allow him to allocate those monies to a mortgage on a home or to the raising of children. Those are certainly commendable goals; however, but the fact that they may not be attainable at this time because of the student loans and the Debtor's, as well as his wife's, current employment situation, does not meet the fundamental standard from which "undue hardship" under Code § 523(a)(8) is measured as set forth in *Brunner* and does not provide a basis for granting the Debtor a partial discharge at this time. The Debtor directs the Court's attention to The National Bankruptcy Re-

view Commission which allegedly recommended the repeal of Code § 523(a)(8) and to the concerns expressed by the New York State Bar Association president in regard to the difficulty in obtaining attorneys who are able to work in public interest law, as the Debtor did for a time, because of the overwhelming debt owed by law school graduates. The Court is not unreceptive to such arguments. However, it is for the Congress to enact legislation to allow students to discharge their loans on less than a showing of "undue hardship." While the Debtor and his wife have experienced some "bumps in the road," the direction they take in the future appears very much in their control based on their age, health, and education. Indeed, it is the very education that he obtained as a result of the student loans at both the undergraduate and graduate levels, which, arguably, should ultimately allow him to pursue employment opportunities not available to others who were unable to pursue higher education for whatever reason. While the Debtor testified that he no longer wishes to continue in the legal profession, certainly, there are other career opportunities available to him by virtue on his education, training and experience.

Based on the foregoing, it is hereby

ORDERED that the debt owed to ASA/ECMC is determined to be nondischargeable pursuant to Code § 523(a)(8); it is further

ORDERED that the debt owed to TERI is determined to be nondischargeable pursuant to Code § 523(a)(8); and it is finally

ORDERED that at this time a partial discharge of the obligations to ASA/ECMC and TERI pursuant to Code § 105 is denied.