In re Robert PORRAZZO, Debtor.

Robert Porrazzo, Plaintiff,

v.

Educational Credit Management
Corporation, Defendant.

Bankruptcy No. 00–50212.
Adversary No. 00–5028.

United States Bankruptcy Court,
D. Connecticut.

March 31, 2004.

Ellery Plotkin, Plotkin & Livolsi, Stamford, CT, for Robert Porrazzo.

Sheila A. Denton, Pullman & Comley, Bridgeport, CT, for Educational Credit Management Corporation.

## MEMORANDUM AND DECISION ON DISCHARGE OF STUDENT LOANS

ALAN H.W. SHIFF, Bankruptcy Judge.

The public policy traditionally served by bankruptcy law is to provide honest debtors with an economic fresh start. In chapter 7 cases, a debtor surrenders nonexempt property to a trustee who distributes it to the holders of allowed claims in exchange for a discharge of dischargeable debts. That equation has served the public interest well by recognizing the social benefits of giving honest but economically distressed individuals a chance to start over and at the same time making a distribution to holders of allowed claims in accordance with the priority scheme established by the bankruptcy code. As noted, the discharge does not include all debts. Here, the debtor seeks a determination that the outstanding balance of his student loans is discharged pursuant to 11 U.S.C.

§ 523(a)(8). For the reasons that follow, judgment shall enter in his favor.[1]

### Discussion

11 U.S.C. § 523(a)(8) provides:

(a) A discharge ... does not discharge an individual debtor from any debt:

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, *unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents.*

 The issue under § 523(a)(8) is whether a debtor has sustained the burden of proving by a fair preponderance of the evidence, *see Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991), that the repayment of a student loan would impose an undue hardship. In this circuit, an undue hardship is defined by a three part test:

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for [him-

self] and [his] dependents if forced to repay the loans;

(2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans; and

(3) that the debtor has made good faith efforts to repay the loans.

*Brunner v. New York State Higher Educ. Servs. Corp.*, 831 F.2d 395, 396 (2d Cir. 1987).[2]

Notably, the Second Circuit's analysis in *Brunner*, which affirmed that the debtor had not demonstrated an undue hardship, included a specific reference to the finding that the debtor was "not disabled." *Id.* Following *Brunner*, courts in this circuit have routinely noted the absence of a disability as a factor for denying a debtor's attempt to discharge student loans. *See, e.g., In re Stern*, 288 B.R. 36, 42 (Bankr. N.D.N.Y.2002) (noting that the debtor suffered "from neither physical or mental disability that would prevent him from earning a living in the future which would permit him to repay his student loans"); *In re Thoms*, 257 B.R. 144, 149 (Bankr. S.D.N.Y.2001) ("An example of an additional circumstance impacting on the debtor's future earnings would be if the debtor experienced an illness [or] developed a dis-

---

**1.** The debtor filed two adversary proceedings for a determination that his student loans should be discharged: proceeding 00–5028, *Robert A. Porrazzo v. AFSA Data Corporation and United States of America*, and proceeding 00–5041, *Robert A. Porrazzo v. Nellie Mae, United Student Aid Funds, Inc. and United States of America.* Educational Credit Management Corporation ("ECMC") was substituted as a defendant in the first proceeding, and, as discovery progressed, the debtor concluded that it was the only defendant. The two adversary proceedings were consolidated into 00–5028, which rendered proceeding 00–5041 moot. A substituted complaint and answer were thereafter filed in proceeding 00–5028.

**2.** Although not raised by either party, it is noted that *Brunner*, which was decided under an earlier version of § 523(a)(8), is still controlling law. The revisions to § 523(a)(8), effective October 1998, eliminated a provision which allowed the discharge of student loans if they had become due more than seven years before the date of the filing of the petition, but did not otherwise affect the statute. Accordingly, as the court in *In re Stern*, 288 B.R. 36 (Bankr.N.D.N.Y.2002), concluded, there is no need to reassess the *Brunner* test due to that minor revision.

ability ...."); *In re Lehman*, 226 B.R. 805, 808 (Bankr.D.Vt.1998) (noting the lack of "physical or psychological problems that would prevent him from working over the loan repayment period"); *In re Borrero*, 208 B.R. 792, 796 (Bankr.D.Conn.1997), *aff'd* 1997 WL 695515 (D.Conn.1997) (noting the debtor had "not offered evidence of any physical or emotional incapacity"); *In re Lohman*, 79 B.R. 576, 581 (Bankr.D.Vt. 1987) ("Exceptional circumstances have been found most frequently as a result of illness ....").

Other courts in this circuit have found undue hardship on the basis of a disability that restricted the debtor's ability to obtain and sustain a level of income sufficient to repay a student loan. *See, e.g., In re Armesto*, 298 B.R. 45 (Bankr.W.D.N.Y. 2003) (agoraphobia); *In re Kelsey*, 287 B.R. 132 (Bankr.D.Vt.2001) (depression and related psychological problems); *In re Doherty*, 219 B.R. 665 (Bankr.W.D.N.Y. 1998) (bipolar disease); *In re Oswalt*, 215 B.R. 337 (Bankr.W.D.N.Y.1997) (anxiety disorder).

█ ECMC has attempted to support its opposition to the dischargeability of this debt by citing to three cases from other circuits. (Tr. of 2/5/04 at 16). Since *Brunner* and its progeny are well established and controlling in this analysis, reference to authority in other circuits is unavailing. Moreover, the underlying facts in the cases cited by ECMC do not correlate with the uncontested facts here. In all three cases, a court denied the discharge of the student loans of a debtor who could repay them without undue hardship notwithstanding some level of physical or emotional impairment. *See In re Phillips*, 2001 WL 1135429 at *2 (Bankr. S.D.Ind.2001) (denying the discharge of student loans for a debtor who suffered from Polycystic Ovarian Syndrome and Congenital Adrenal Hyperplasia because the conditions were controlled by medication, and they did not affect her current or future income); *Educational Credit Management Corp. v. Ross*, 262 B.R. 460, 463 (W.D.Wis.2000) (denying the discharge of student loans because the debtor was able to work despite physical ailments and depression, which could be controlled through medication); *In re Ritchie*, 254 B.R. 913, 916 (Bankr.D.Idaho 2000) (denying the discharge of student loans where there was no evidence that the debtor's medical conditions affected his ability to work). In contrast to those cases, the uncontested evidence here is that the debtor is permanently disabled and unemployable. *See infra* at 350 – 351.

## I

**The debtor cannot maintain, based on current income and expenses, a minimal standard of living for himself if forced to repay the loans.**

█ As the court in *In re Stein*, 218 B.R. 281, 287 (Bankr.D.Conn.1998), observed, "[d]istilled to its essence, this test requires the Court to examine the Debtor's current income and expenses and determine a flexible minimal standard of living level sensitive to the particular circumstances of each case through the application of common sense." While the minimal standard of living test requires more than proof that repayment would require major personal and financial sacrifices, it "does not require the Debtor to demonstrate that repayment of the loan would cause him ... to live at or below the poverty line." *Id.*

The 29–year old debtor in this case resides with his mother in her home in Cos Cob, Connecticut, and, instead of paying rent, he pays her a portion of the household expenses. The debtor's mother testified that those arrangements may not be

available in the future because she will retire within a few months, and she may have to sell the house to raise money for her retirement. (Tr. of 1/2/04 at 71).[3]

The debtor's sole source of money is Supplemental Security Income under the Social Security Act ("SSI"), which currently pays him $590 per month (after a deduction for a Medicare premium is taken out). (Pl.Ex. B). His schedules show essentially no expenditures over basic living expenses, and those are only made possible because his mother essentially underwrites his housing. Common sense compels the conclusion that a person residing in Fairfield County, Connecticut with an annual disposable income of $7,080 will not have the means to afford much more than bare necessities.[4]

■ ECMC's attempts to challenge that conclusion were ineffective. For example, ECMC argued that the debtor's monthly expense included a $10 per month charge for internet access. Despite the fact that debtor suffers from a disease which makes social interactions difficult and stressful, *see infra* at 350 – 351, ECMC's counsel questioned why he had not considered free alternatives at the public library. ECMC also identified 10 checks that the debtor wrote between April and August, 2003. (Def.Ex. 4). Several, in the aggregate amount of only $174.97, were for television or internet purchases.[5] Other checks, totaling $30 over those five months, were for donations.[6] The debtor testified that he occasionally donated very small amounts, and the minimal amount of those checks validates his testimony. (Tr. of 1/21/04 at 125–26). The balance of the checks, totaling $207.94, were for automobile related expenses.[7] The debtor and his mother testified that he is responsible for all expenses of an automobile she owns but was purchased for his use. Any suggestion that a minimal standard of living necessitates that the debtor rely solely on public transportation, even assuming it is available and reasonably convenient, as to which no evidence was offered, is a *non sequitur.*

Neither the debtor nor his mother were able to accurately delineate the precise amount of his monthly contribution to the household expenses. That confusion, however, was not the result of collusion or deceit, but rather because the debtor's contributions varied from month to month, and they did not keep a ledger of his

3. The debtor is working with a vocational counselor, Daniel Cicerco. Mr Cicero has encouraged him move out of his mother's house, reasoning that independent housing would be psychologically beneficial. (Tr. of 1/21/04 at 105). Following that advice, the debtor has applied for section 8 housing, a form of publicly assisted housing.

4. The court notes, without basing its decision on the fact, that for a family unit of one, the 2004 Department of Health and Human Services poverty guideline is an annual income of $9,310 and the 2003 United States Census Bureau poverty threshold is an annual income of $9,573. *See* http://aspe.hhs.gov/poverty/04poverty.shtml *and* http://www.census.gov/hhes/poverty/threshld/thresh03.html; *see also In re Lebovits*, 223 B.R. 265, 271 n. 4

(Bankr.E.D.N.Y.1998) (explaining the difference between the two standards).

5. *See* check # 103 for $23.76 payable to QVC, check # 111 for $34.39 payable to QVC, check # 110 for $22.86 payable to Amazon,com, check # 113 for $13.96 payable to Amazon.com, check # 112 for $22.06 payable to Amazon.com and check # 115 for $57.94 payable to Amazon.com.

6. *See* check # 108 for $10 payable to TVC (memo states "donation") and check # 107 for $20 to The PTC (memo states "donation").

7. *See* check # 109 for $56.42 payable to Tax Collector, Town of Greenwich and check # 104 for $151.52 payable to H & L Chevrolet.

payments. In sum, it is apparent from their testimony that the debtor, living solely on SSI while residing in his mother's home, attempts, as best he can, to contribute towards the household expenses.

It is accordingly concluded that if forced to repay the approximately $22,747 debt owed to ECMC, the debtor will not be able to maintain a minimal standard of living.

## II

**Additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans.**

■ As noted, it is well established that a mental or physical disability may satisfy the second prong of the *Brunner* test. The uncontested evidence here is that the debtor suffers from a Asperger's Syndrome, a form of autism. Dr. Jeffrey S. Cohen, a clinical psychologist, testified:

> Autism is a chronic disorder of neuro-developmental characteristics where a person has extremely poor interactive abilities. [People who suffer from autism] have a difficulty maintaining eye contact [and] do not relate well to others. Their thinking is very stereotype. They maybe have ritualistic behavior.
>
> . . .
>
> [The debtor] has a very poor gaze. He's had a history of extremely poor interpersonal relationships. He cannot relate well to other persons and this is where his inability to function on the job is—his lack of interpersonal skills. He misses subtle clues. He becomes very anxious and aggressive during the interviews and exhibits a great deal of anxiety.

(Tr. of 1/21/04 at 15–16). Dr. Cohen testified that the debtor losses control when he feels anxiety. He diagnosed the debtor with "generalized anxiety disorder." (Pl. Ex. A; *see also id.,* attached report of Dr. Sanders M. Stein).

ECMC did not present any evidence to contest the Asperger's Syndrome diagnosis. To the contrary, its cross-examination of the debtor's witnesses served to further demonstrate the severity of the debtor's condition. For example, it was elicited that Asperger's Sydnrome is a permanent disability which causes an individual an "extreme amount of stress, anxiety and agitation" if forced into any deviation from a routine. (Tr. of 1/21/04 at 30–32). Dr. Cohen also testified that while the debtor understands his diagnosis, he may not understand his limitations. However, even if he did, that would not necessarily make it easier for him to find and maintain a job. (Tr. of 1/21/04 at 37).

The debtor's job history following his graduation from the University of Connecticut in 1996 corroborates that testimony. He was employed by Connecticut Public Radio after an internship during college, but that job was only for 21 hours per week, with no benefits, and he was fired after a verbal altercation with a co-worker. Through the help of a job coach, he later found a few hours of employment at Pitney Bowes, but that was in a supervised setting, *i.e.,* there was specific help to assist him in dealing with co-workers. Even with that he assistance, he was fired after his supervisor was changed, because, on several occasions, he could not control his anger. (Tr. of 1/21/04 at 18, 34–35, 93, 124).

Indeed, even when he was employed, his earning capacity was minimal:

| Year | Total Income/ Adjusted Gross Income |
|---|---|
| 1995 | $1,049 |
| 1996 | $4,480 |
| 1997 | $10,105 |
| 1998 | $11,097 |
| 1999 | $13,561 |

| | |
|---|---|
| 2000 | $12,038 [8] |
| 2001 | $192 |
| 2002 | $1,961 |

Most telling, the Social Security Administration found that the debtor was disabled as of May 23, 2000 and therefore entitled to SSI payments. (Pl.Ex. B). As noted, the SSI payments have continued to present and are his sole source of income.

The record is rife with the debtor's unsuccessful efforts to manage his disability, even with counseling and behaviourial therapy, and to find and sustain employment. Unfortunately, he will be battling his disability for life, and there are very limited tools with which the medical community can assist him. Since the debtor's mental condition is permanent, it is unlikely that he will ever be able to accomplish his goal of finding work. Moreover, his inability to do so adds significantly to his anxiety and depression which in turn exacerbates his unfortunate condition. (Tr. of 1/21/04 at 103–04).

Accordingly, it is concluded that the debtor has satisfied the second prong of the *Brunner* test.

### III

### The debtor has made good faith efforts to repay the loans.

■ ECMC challenged the debtor's good faith by questioning whether he considered consolidating his student loans through the William D. Ford Direct Loan Repayment Program (the "Program"). Obviously, the mere existence of the Program does not mandate the conclusion that a debtor who does not apply for its benefits has failed to satisfy the good faith test and therefore is not entitled to a discharge under § 523(a)(8). Such a result would nullify that section and the legislative in-

tent it serves. ECMC's counsel has conceded that conclusion when questioned during oral argument. (Tr. of 2/5/04 at 46).

Parenthetically, it is noted that the only evidence ECMC offered that the debtor qualified for the Program was a letter from its counsel which merely suggested that possibility (Def.Ex. 1), and minimal and unpersuasive cross-examination regarding that exhibit. Thus, there is nothing in the record to suggest that the Program was available to the debtor. But even assuming the debtor qualified, for the reasons discussed below, the evidence offered by the debtor satisfies the good faith prong of the *Brunner* test.

At the onset, it is noted that *In re Thoms*, 257 B.R. 144 (Bankr.S.D.N.Y. 2001), on which ECMC relies, is unavailing for the reason that the evidence before the *Thoms* court was not comparable to the facts in this proceeding. The debtor in *Thoms* had a salary of $48,000, had been employed full-time nearly continuously after her graduation, and had at least $550 per month of disposable income with the prospect that her financial situation would improve in the near future. Further, she did not have a disability, which the *Thoms* court specifically noted was a potential "additional circumstance" under *Brunner*. The *Thoms* court discussed the fact that even if the debtor could not at that time pay the full amount of her scheduled monthly student loan payments, utilization of the Program would enable the debtor to lower her monthly payments to amounts that she could reasonably afford. The court listed her failure to consider the Program as one element of its determination she lacked good faith, just as it listed her failure to seek child support for her daughter from the father and her failure to

---

**8.** In the year 2000, only $8,393 of the reported income was from earned income; the remaining $3,645 received was unemployment compensation.

seek alternative sources for her support of her siblings. In sum, failure of the debtor in *Thoms* to take advantage of the Program was merely one piece of a larger picture demonstrating that the debtor did not satisfy the *Brunner* test. In contrast to *Thoms*, the evidence here demonstrated that the debtor is permanently disabled, and despite a continuous effort to find steady employment at a rate of pay sufficient to repay the student loans, he is unable to do so.

ECMC referenced a type of repayment option under the Program entitled the Income Contingent Repayment Plan ("ICR") under which a borrower's payment is determined by the amount of his annual income, and that if a borrower's income is below a certain level, then the payment at that time is zero. At the end of 300 months (25 years), whatever amount was not due to be repaid under that formula is forgiven.

ECMC argued that the debtor's failure to consider the Program, particularly in light of ICR, rather than seeking a discharge under 11 U.S.C. § 523(a)(8) demonstrates a lack of good faith. That argument overlooks the evidence that the debtor did in fact consider, and then reject, the suggestion that he apply for the Program because it could potentially require payments for 300 months. (Tr. of 1/21/04 at 121–22). Viewed in the context of the evidence that the debtor's generalized anxiety disorder was exacerbated by his outstanding student loans, *see* supra at 351, it is understandable that he rejected a program that would have prompted a review of his status on a regular basis for 300 months. Moreover, Dr. Cohen testified during cross-examination that the debtor had a limited ability to make decisions regarding the Program:

> Q Do you believe if he was given some options to address his student loan he would be able to understand those options, like repayment options, including one that would result in no payment?
>
> A I think his comprehension of it is probably moderate based upon his formal IQ scores that were given. His earlier IQ scores were in the low/average range, with a full-scale IQ of 80. That's at the low end of the low average ranges. So his total comprehension is probably limited.
>
> Also, his anxiety becomes so overwhelming when he thinks about this, he may lose the capacity to grasp logically the steps needed to make these types of decisions.

(Tr. of 1/21/04 at 33–34).

As to the merits of the good faith prong of the *Brunner* test, from February 16, 1994 through October 3, 2001, the debtor made seven payments of his student loans, totaling $1,442.89, when he was employed. During the majority of that period, his loans were in deferment, which meant he was not then required to make payments. (Def.Ex. 3).

There was also extensive evidence about the debtor's efforts to find employment. Not only has he constantly searched the internet for job listings and sent numerous letters seeking employment, but he regularly met with Daniel Cicero, a supervisor and counselor at a vocational rehabilitation program, in an attempt to find employment. (Tr. of 1/21/04 at 91–106). The debtor is interested in and was educated for a career in radio. ECMC questioned whether he had unreasonably restricted his search to employment in radio, but the evidence proves that he widened his search by preparing and circulating a separate resume for such jobs. (Pl.Ex. D; Tr. of 1/21/04 at 94–95).

The debtor's efforts to find employment, so that he could repay the balance of loans,

leaves no alternative conclusion but that he has made a good faith effort to pay them. That conclusion is buttressed by the testimony of Dr. Cohen that the debtor was very anxious and depressed because despite his continued effort, he couldn't find employment and repay the his student loans. (Tr. of 1/21/04 at 103–04).

It is therefore concluded that the debtor has attempted in good faith to repay the student loans.

## Conclusion

As has been noted in this circuit, a "debtor's 'fresh start' is fatally undermined if it comes at [the] perilous price" of threatening his health. *In re Kelsey,* 287 B.R. 132, 144 (Bankr.D.Vt.2001). Regretfully, ECMC forced the debtor to expend funds to prove that result even though it knew long before trial[9] that he could prove a prima facie case under § 523(a)(8), *i.e.,* he suffered from Asperger's syndrome, a permanent and disabling mental condition for which there is no known cure, and as a result he was essentially unemployable. Since ECMC offered no witnesses and minimal evidence, its decision to challenge the discharge of the student loans is not only unexplainable, but, worse than that, it eroded the debtor's discharge and needlessly exasperated his anxiety and depression.

For the foregoing reasons, judgement shall enter in favor of the debtor that the subject student loans are discharged and IT IS SO ORDERED.

---

9. The debtor produced detailed expert reports in accordance with the pretrial orders and also produced extensive responses to ECMC's lengthy interrogatories.