**In re Janine E. VINCI, Debtor.**

**Janine E. Vinci, Plaintiff,**

**v.**

**Pennsylvania Higher Education Assistance Agency, Defendant.**

**Janine E. Vinci, Plaintiff,**

**v.**

**Texas Guaranteed Student Loan Corp., Defendant.**

**Bankruptcy No. 98–14252 SR. Adversary Nos. 98–623, 98–624.**

United States Bankruptcy Court, E.D. Pennsylvania.

April 30, 1999.

646

Carole Hendrick, Collegeville, PA, for Debtor.

William R. Kane, Philadelphia, PA, trustee.

Kevin Murphy, Harrisburg, Pa, Donald O. Johnson, Media, PA, for PHEAA.

## OPINION

STEPHEN RASLAVICH, Bankruptcy Judge.

Before the Court are two adversary proceedings brought by Debtor, Janine E. Vinci to determine the dischargeability under 11 U.S.C. § 523(a)(8) of student loan debts owed to Defendants Texas Guaranteed Student Loan Corporation ("TGSLC") and Pennsylvania Higher Education Assistance Agency ("PHEAA"), both guarantors of certain student loans defaulted upon by the Debtor. The foregoing matters were consolidated for purposes of trial in a single proceeding due to the similarity between the respective legal and evidentiary issues. The consolidated proceeding was tried on March 18, 1999, after the conclusion of which the Court took the matter under advisement. For the reasons stated more fully below, the Court finds the Debtor's student loan debts to be nondischargeable under 11 U.S.C. § 523(a)(8).

## JURISDICTIONAL STATEMENT

The Court has jurisdiction over the parties and subject matter of this core proceeding pursuant to 28 U.S.C. § 1334, § 157(a), § 157(b)(1) and (b)(2)(A), (I) and (O).

## BACKGROUND

The Debtor filed a petition for relief under Chapter 7 of the Code on March 3, 1998. According to Schedule F of her petition, the Debtor owed approximately $257,796 in unsecured non-priority debt as of the petition date. The foregoing amount appears overstated somewhat due to the listing of several debts, including the student loans at issue herein, more than once.[1] In the matter presently before the Court the Debtor seeks a determination that student loan debts owed to TGSLC and PHEAA, totaling approximately $72,800, are not excepted from discharge under § 523(a)(8) of the United States Bankruptcy Code (the "Code"). 11 U.S.C. §§ 101–1330. The joint pretrial statement filed in this case clarified that the precise amount owed to TGSLC is $47,969.96, and the amount owed to PHEAA is $24,830.02.

The Debtor is a well educated individual. She holds a Bachelor's degree in communications which she received from Temple University prior to 1984. Sometime after receiving her B.A. degree, the Debtor began taking classes at Temple towards a Master's degree in social work, though she did not complete this course of study. In 1984 she again returned to school, receiving a Juris Doctor (JD) degree from Temple University School of Law in 1987. In

---

1. The Debtor listed a total of $257,796 in unsecured debt on Schedule F of her petition. This sum included approximately $185,019 in student loans. A review of these loans revealed several instances in which the same debt was listed more than once. Presumably, the duplicate listings resulted from the Debtor listing both the private lender that held her student loan and the guarantor that satisfied such indebtedness after her default—the Debt-
or thereafter listing the same debt as being owed to both entities. However, once a guaranteeing agency makes good on a student loan by satisfying the outstanding balance due the private lender, the debt remaining due is owed to the guarantor, not the private lender. It would appear, therefore, that the Debtor's schedules overstate the student loan debts by as much as $112,219.

1994 she returned to school once again and received a Master of Laws (LL.M.) degree in trial advocacy from Temple.

Prior to becoming a lawyer the Debtor was a social worker for the City of Philadelphia. She testified that for about seven years before starting law school she was a case manager working for the Department of Human Services in Philadelphia. It was apparently with an eye toward advancing her career in this field that the Debtor began taking the aforesaid Master's degree course work at Temple. The Debtor testified, however, that she eventually developed aspirations of becoming a child advocate, and thus abandoned her course of study to pursue a law degree. While she was in law school the Debtor obtained clinical experience working as a student intern in the U.S. Attorney's Office in Philadelphia. She also gained work experience, while still in law school, by serving as an intern at Community Legal Services of Philadelphia.

The Debtor testified that despite passing the Pennsylvania bar examination on her first attempt, she had difficulty finding employment in her new profession. She testified that for a short period of time after graduation, up until about the time she sat for the bar exam, she continued to work as an intern for Community Legal Services. However, due to the unavailability of a full time staff attorney position in that office, she left Legal Services and "took some time off." She testified that during this hiatus she actively looked for a permanent position elsewhere in the legal community. In or about February 1990 she was hired by the Public Defenders office in Montgomery County. She testified that she worked as an assistant public defender for two or three years, ultimately leaving that position in 1992 or 1993. She testified that while at the public defenders office she tried approximately twelve cases before a jury, and made numerous court appearances on matters including bail hearings, suppression hearings, parole violations, mental health hearings, protection from abuse cases, and DUI cases.

The Debtor did not explain why she left the Public Defenders office. It appears, however that the Debtor's involvement in several automobile accidents may have played a role in her departure. The Debtor testified that between 1990 and 1995 she was involved in four automobile accidents in which she suffered physical injuries. The first accident occurred in or about October 1990. According to the Debtor, this accident left her unable to work for an unspecified period of time. She testified that despite her inability to return to work right away, the Public Defenders office held her job open and allowed her to return after she had recovered sufficiently from her injuries. She added that although her position remained open, she did not receive any pay during the time that she was out of work. The Debtor was again involved in auto accidents in April 1991, August 1993, and in or about February 1995. She testified that in all of the accidents she was "rear ended" by the driver in the car behind her. While the Debtor could not remember whether she obtained a financial recovery stemming from the injuries sustained in the first, third or fourth accidents, she was able to recall that she received approximately $40,000 as a financial settlement arising from the second accident. She testified that she had been using the settlement proceeds (claimed as exempt assets in her bankruptcy schedules), in part to make up for the loss of income she had experienced due to unemployment. She added that at the time that her petition was filed only about $7,500 of those funds remained. As of the trial date she testified that this amount had dwindled to about $1,000. The Debtor testified that she continues to have trouble with her neck and shoulders as a result of the accidents, and that she lives in chronic pain. She sees a chiropractor two to three times a week for this condition. The Debtor also suffers from asthma, though the condition is controlled through the use of medication.

The Debtor has not been employed since leaving the Public Defenders office. She testified that despite actively looking for work she has not been able to secure a position. She testified that she enrolled in Temple's LL.M. program in trial advocacy believing that it might improve her employment prospects. She borrowed $18,500 under a government sponsored student loan guarantee program to finance her tuition and defray some of her living expenses during that program. She graduated from the program in 1995 with an LL.M. in trial advocacy. She testified that since that time she has submitted hundreds of resumes and been on dozens of interviews, all to no avail.

The Debtor, testified that, after having virtually all of her employment applications since 1993 rejected, she decided in or about April 1998 to strike out on her own as a sole practitioner. In April 1998 she set up shop by renting office space for $600 a month, plus utilities. The office was equipped with a computer she borrowed from an uncle, and a fax machine and copy machine she bought later in the year. She testified that since opening her practice she has handled criminal matters including DUI's, suppression hearings, and a protection from abuse case. She opined that she is competent to handle virtually any criminal matter aside from a death penalty case. On the civil side, she testified that she has handled matters such as a commitment hearing, two divorces, a medicare case, a workers compensation appeal, and an adoption. She also testified that she won a judgment in a personal injury matter that was tried before a jury. She added that her adversary in the matter was a lawyer from a well known law firm in Philadelphia that had at one time rejected her application for employment. She

testified that she joined the Philadelphia Bar Association in January of this year and that she is participating on a committee known as the Philadelphia Working Women at Home Committee. She also testified that she is fostering contacts with other attorneys to garner possible referral business. She added, however, that her ability to generate new business is limited in part due to lack of malpractice insurance. She stated that because of this deficiency she is ineligible to receive bar association client referrals or appointment to certain cases by the courts.

The Debtor testified that her income from self employment has averaged about only $800 per month since April 1998.[2] She added that part of the reason that her income is so low is that many of the clients she has either cannot afford to pay her, or have only a minimal ability to do so. For example, she testified that she charged only a $300 fee in a protection from abuse matter that required two court appearances, and then charged the same modest fee for two DUI cases. She also testified that she charged a fee of $150 an hour in the divorce matters she has handled. She explained that she has accepted some work without compensation as a means of gaining additional experience and honing her skills. She also testified that despite the foregoing efforts to establish a law practice of her own, she continues to submit resumes in search of regular employment with a law firm or governmental agency. Her expectations of obtaining such employment, however, are diminished.

The Debtor testified that as of the petition date her monthly expenses were averaging between $1,500 and $2,000 per month. She added, however, that since the beginning of this year she had been able to reduce her expenses somewhat by

---

**2.** The Debtor testified that the income generated by her law practices since April 1998 was as follows: April and May, 1998—$0.00; June—$800; July—$1,365; August—$1,005; September—$1,175; October—$5,387 ($5,200 of which was a fee from a personal injury settlement); November—she could not recall; December $0.00; January, 1999—she could not recall; and February—$550. She also testified that she has a judgment against a client for legal fees in the amount of $2,300 which the client is voluntarily paying her at a rate of $100 a month.

taking advantage of certain membership benefits of the Philadelphia Bar Association. She testified that through the bar association she been able to obtain a lower cost, higher quality, health insurance plan. The improved health plan has in turn enabled her to reduce her monthly expenditures for prescription medications. Bar association membership has also resulted in lower costs for mandatory CLE classes. The Debtor testified that imminently (and probably already) she will further reduce her monthly expenses by giving up the rented office space and moving her fledgling practice into the front room of her home. Apparently the house where the Debtor resides has a storefront that at one time housed her grandfather's shoemaker business. She expressed the desire of establishing a "neighborhood" law practice out of the storefront. The Debtor testified that this is possible because her mother, with whom she co-owns the unencumbered house, now resides in a nursing home. Operating a storefront law practice from her home will enable the Debtor to reduce her monthly expenses by approximately $600, and may also result in lowering some of her taxes. Although the Debtor testified that the home is in need of extensive repairs, the appraisal on the home conducted at the behest of the Debtor in June 1998, reflected a value of $33,000, without exception for any of the extraordinary repairs she suggested, e.g. new walls and ceilings in several rooms. The appraisal report rates the condition of items inside the house—such as walls, floors, plaster, ceilings, and bathroom tiles—as average. The only exception noted on the report is the need for a new floor on the first floor. The estimated cost for such remediation is $1,000. Presumably, however, some additional work will be needed to make the front room of the house suitable to serve as a law office. The Debtor testified that she hoped to reduce her monthly expenditures to $1,000 or less as a result of all of the forgoing measures.

The Debtor testified that despite these measures, monthly survival is a constant struggle. She stated that while in the past she had been able to make ends meet by utilizing some of the money she received from the financial settlements resulting from her auto accidents, these funds are now mostly depleted. On cross examination the Debtor admitted, however, that she has not tried to earn a living by returning to social work, nor has she tried to supplement her income by seeking work in a field other than the law. She testified that although she at one time sought employment as a paralegal, she found this work to be unsuitable because she does not type very well and because she is dyslexic.

The Debtor's student loan history may be summarized, as follows: The student loans in question are owed to two defendants: TGSLC and PHEAA, each a guarantor of loans previously issued to the Debtor by private lenders. On August 16, 1989, the Debtor executed a promissory note consolidating the balances now due TGSLC into one new loan. Payments on that loan first came due on December 17, 1989, and were to continue for ten years, excepting any periods of deferment. Thereafter, the Debtor requested and was granted three periods of deferment: October 12, 1990 through September 1, 1991; August 26, 1992 through March 26, 1993; and June 27, 1993 through November 28, 1993. The Debtor's consolidated student loans were thus in deferment for a total of 691 days. Although the Debtor made some payments on the consolidated loan early on, no payments were made after the termination of the last deferment period. The Debtor ultimately defaulted on this obligation and the loan was purchased by the guarantor, TGSLC. According to the parties joint pretrial statement the Debtor owes TGSLC $47,969.96.

The Debtor borrowed another $18,500 to finance her LL.M. Payments on this loan, in the amount of $239 per month, were to have commenced on December 1, 1995. The Debtor has made no payments on this debt, nor did she seek a deferment of the

payment obligation. PHEAA honored the guarantee on the loan by purchasing the defaulted account from the private lender on or about January 10, 1997. The Debtor today owes PHEAA $24,830.02.

The Debtor seeks a determination from this Court that all of the foregoing debts are not excepted from discharge under Code § 523(a)(8), but rather are dischargeable under the undue hardship provision of that section. 11 U.S.C. § 523(a)(8)(B).[3] Alternatively, the Debtor seeks a determination that the student loan debt owed to TGSLC is discharged because the seven year limitations period barring the dischargeability of such obligations provided by Code § 523(a)(8)(A) expired prior to the filing date of her bankruptcy.

### DISCUSSION

Code § 523(a)(8) excepts student loan debts from discharge in bankruptcy. In 1998 Congress amended Code § 523(a)(8) to eliminate a provision in the statute that had negated the exception with respect to certain student loan debts. 11 U.S.C. § 523(a)(8)(A). This amendment, however, is not retroactive and is only effective for bankruptcy cases filed on or after April 1, 1998. The Debtor's Charter 7 bankruptcy case was filed on March 3, 1998, and is thereby unaffected by the foregoing change. The version of Code § 523(a)(8) applicable to this proceeding provides as follows:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

3. Code § 523(a)(8) was amended in 1998 to eliminate a seven year limitations period on the dischargeability of student loan debts. See discussion infra. In its current iteration the statute provides as follows:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution,

\* \* \*

(8) for an educational benefit overpayment or loan made, insured or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution, or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless—

(A) such loan, benefit, scholarship, or stipend overpayment first became due more than 7 years (exclusive of any applicable suspension of the repayment period) before the date of the filing of the petition; or

(B) excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents;

11 U.S.C. § 523(a)(8).

The Debtor's argument that the student loan debt owed to TGSLC is discharged because it falls outside of the seven year term provided by Code § 523(a)(8)(A) is readily disposed of because the foregoing limitations period is tolled during periods of deferment. While the student loan owed to TGSLC first came due on December 17, 1989, more than eight years before the petition date, the Debtor requested and was granted three deferments totaling a period of 691 days. According to the payment period calculation provided by TGSLC, Exhibit TGSLC—2, the loan had been in repayment for a total 3,032 days, less 691 days of deferred payments.[4] Subtracting 691

or for an obligation to repay funds received as an educational benefit, scholarship or stipend, unless excepting such debt from discharge under this paragraph will impose an undue hardship on the debtor and the debtor's dependents;
11 U.S.C. § 523(a)(8).

4. Although the Debtor initially objected to Exhibit TGSLC—2 on grounds that she disputed whether a third period of deferment was granted, the Court admitted the document under the business record exception to the hearsay rule. However, the Court afforded

from 3,032 yields an actual repayment period of 2341 days—roughly 6.41 years. Therefore, the debt owed to TGSLC is not subject to the seven year limitations period provided by Code § 523(a)(8)(A).

 Next, the Debtor argues that she should be granted a discharge from the student loan debts owed to TGSLC and PHEAA under the "undue hardship" exception in the statute. Code § 523(a)(8)(B). The standard to be applied in determining whether the undue hardship exception applies was clarified by the Court of Appeals for the Third Circuit in *In re Faish,* 72 F.3d 298 (3d Cir.1995), *cert. denied, Faish v. Pennsylvania Higher Educ. Assistance Agency,* 518 U.S. 1009, 116 S.Ct. 2532, 135 L.Ed.2d 1055 (1996). In *Faish,* the Third Circuit adopted the following three part test set forth by the Court of Appeals for the Second Circuit in *Brunner v. New York State Higher Educ. Services Corp.,* 831 F.2d 395 (2d Cir.1987):

(1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans; (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for the student loans; and (3) that the debtor has made good faith efforts to repay the loans.

*Faish,* 72 F.3d at 304–306 (citing *Brunner,* 831 F.2d at 396). In adopting the *Brunner* test the Third Circuit expressly reject-ed two earlier tests—the *Johnson* test and the *Bryant* test—that had originated in the Bankruptcy Court for the Eastern District of Pennsylvania.[5]

 Student loan debtors have the burden of establishing each element of the *Brunner* test. If one of the elements is not satisfied the inquiry comes to an end and the student loan debt may not be discharged. In *Faish* the Third Circuit made it clear that extraneous factors not contemplated within the *Brunner* framework may not be imparted into the analysis in order to support a finding of dischargeability in what might otherwise appear to be a sympathetic case. Regarding the policy behind the exception, the *Faish* Court stated:

The *Brunner* standard meets the practical needs of the debtor by not requiring that he or she live in abject poverty for up to seven years before a student loan may be discharged. On the other hand, the *Brunner* standard safeguards the financial integrity of the student loan program by not permitting debtors who have obtained the substantial benefits of an education funded by taxpayer dollars to dismiss their obligation merely because repayment of the borrowed funds would require some major personal and financial sacrifices.

*Faish,* 72 F.3d at 305–306.

Turning to the facts of the instant case, the Court finds that the first element of the *Brunner* test has been met. There really can be no doubt in this case that the Debtor is presently struggling financially

---

the Debtor an opportunity to check her records and thereafter request the trial record to be reopened for the limited purpose of rebutting the exhibit. The Debtor did not make a request for the record to be reopened. The Court notes that even if the third deferment period, lasting 154 days, had not been granted, the loan was still in payment less than seven years prior to the filing date of the petition.

5. *See In re Johnson,* 5 Bankr.Ct.Dec. 532 (Bankr.E.D.Pa.1979) and *In re Bryant,* 72 B.R. 913 (Bankr.E.D.Pa.1987). The Debtor's counsel argued her client's case under the obsolete *Johnson* test. The *Johnson* test involved a tripartite analysis that was criticized by the Third Circuit as "unnecessarily complicated and unduly cumbersome." *Faish,* 72 F.3d at 303. This approach required the court to consider three separate tests: 1) a "mechanical" test; 2) a "good faith" test; and 3) a "policy" test. This approach also required the court to answer a series of questions within each test. A more thorough examination of the *Johnson* test is provided in the *Faish* decision. *See* 72 F.3d at 303–304.

and is unable to provide herself with a minimal standard of living, even before taking into account any payments due on her student loans. She testified that since filing her bankruptcy petition her monthly expenses have averaged about $1,700 a month, while her income during the same period had averaged only approximately $800 per month. She apparently made up the difference between these sums, at least in part, by dipping into the exempt monies she received as a result of personal injuries sustained in an auto accident. The Court notes however that, even if the Debtor were to succeed in her goal of reducing her monthly expenses to approximately $1,000, a monthly income of only $800 would still not be sufficient to cover these expenses, even before taking into consideration any payments required on her student loans. Accordingly, the first of the *Brunner* criterion is satisfied here.

The next *Brunner* element requires a showing that the Debtor's inability to provide a minimal standard of living is likely to persist for a "significant portion of the repayment period. . . ." This factor properly takes into account the nature of education as a long term investment that may not pay dividends for years to come. While the Debtor's current economic situation is admittedly weak, no evidence was submitted that established that the situation cannot be expected to improve in the future. On the contrary, the evidence presented at the trial demonstrated that the Debtor has the capacity to generate an income through her developing law practice, or otherwise. Although the Debtor has been a sole practitioner for only approximately ten months, she testified that within the last four months or so she has joined both the Philadelphia Bar Association and a bar association subcommittee focusing on woman lawyers working from home. Participation in such groups can reasonably be expected to assist the Debtor in making contacts and gaining exposure for her practice. The Debtor also testified that due to changes in her person-

al situation, e.g., her mother being admitted to a nursing home, she is now able to devote more time and energy to the practice of law. The Debtor, more over, is well educated and articulate. Thus, even if she were to give up the practice of law altogether, it would be reasonable to expect her to be able to use her legal and other skills, *e.g.*, experience gained in the social work field, to earn an income that would enable her to sustain herself and to repay her student loans. Based on the foregoing the Court concludes that the second *Brunner* criterion has not been met, thus ending the inquiry.

Even if the Court were to assume *arguendo* that the second criterion had been met, it would nonetheless find that the third element, *i.e.*, a good faith effort to repay the loan, was not satisfied here. In this regard the Court notes that in or about 1993 or 1994 the Debtor received approximately $40,000 as a result of personal injuries sustained in an automobile accident. Despite having this sum at her disposal the Debtor did not utilize any of the funds to pay any portion of her student loan debts. Moreover, the Debtor did not use any portion of these monies to fund her LL.M. studies. Rather, the Debtor financed her tuition and some of her living expenses with funds obtained through an additional student loan. The Court notes that after the Debtor completed her studies and received the LL.M. degree, she did not make a single payment on account of such loan, nor did she request a deferment of her loan payments because she was not employed. Finally, the Court notes that the Debtor did not engage in any part time work, whether inside or out of the legal field, to supplement her income and possibly make small payments against her loan balance while she was searching for work in her field. The Debtor has apparently taken the position that she is absolved from paying her legal education loans if she is not gainfully employed as a lawyer. This is not the standard. Borrowers under the various

guaranteed student loan programs are obligated to repay their loans even if they are unable to obtain employment in their chosen field of study.

In the latter respect, the Court has a degree of skepticism concerning the Debtor's avowed efforts to obtain third party employment in her chosen field. At trial the Debtor produced no copy of her resume, only one transmittal letter that had accompanied an employment application, and no rejection letters; all of this despite her testimony of having contacted scores of employers and gone on numerous interviews. The Debtor further purports to have little insight as to why, despite having such clearly impressive credentials, she is wholly unable to gain even an entry level position with any legal service provider in any local market. This is difficult to understand given the Debtor's academic credentials, her work experience, and her poise and demeanor in the Courtroom. Indeed, this seeming paradox undermined the Debtor's credibility, and led the Court to suspect that the Debtor has consciously, or perhaps unconsciously, either sabotaged her own employment efforts, or unduly restricted her employment horizon to only those positions deemed by her to be worthy of one with her admitted accomplishments. The *Faish* test does not permit self indulgence. Consequently, the Debtor's evidence on these points would have adversely impacted her case on the third of the *Faish* tests, had the Court needed to reach it.

Based on the foregoing findings of fact and conclusions of law, the Debtor is not eligible for a discharge of her student loan debts under the undue hardship exception of Code § 523(a)(8)(B). Accordingly, the Debtor's student loan debts are declared nondischargeable.

An Order consistent with this Opinion shall be entered concurrently herewith.

### ORDER

**AND NOW,** this 30th day of April 1999, upon request by the Debtor for a determination of the dischargeability of certain student loan obligations in each of the above captioned adversary proceedings, and after an administratively consolidated trial of such proceedings having been held on March 18, 1999, it is, for the reasons stated more fully in the accompanying Opinion, hereby

**ORDERED,** that the student loan debt owed to defendant Texas Guaranteed Student Loan Corporation is non-dischargeable pursuant to 11 U.S.C. § 523(a)(8); and it is further

**ORDERED,** that the student loan debt owed to defendant Pennsylvania Higher Education Assistance Agency is non-dischargeable pursuant to 11 U.S.C. § 523(a)(8).