In re Irving Courtley JONES, Debtor.

Irving C. Jones, Plaintiff,

v.

Educational Credit Management Corporation, Defendant.

Bankruptcy No. 06–13628bf.
Adversary No. 07–0217.

United States Bankruptcy Court, E.D. Pennsylvania.

July 22, 2008.

Irving C. Jones, Philadelphia, PA, pro se.

John P. Neblett, Boyle, Neblett & Wenger, Camp Hill, PA, for Defendant.

## MEMORANDUM

BRUCE FOX, Bankruptcy Judge.

In the above-captioned adversary proceeding, the plaintiff, Irving C. Jones, asserts that his numerous student loan obligations should be discharged under chapter 7 as they impose an undue hardship upon him pursuant to 11 U.S.C. § 523(a)(8). Mr. Jones contends that he is now, and has been throughout the course of his life, indigent and unable to repay his educational loans. He further asserts that his impecunious financial condition is unlikely to change in the future. Mr. Jones asserts that he meets the three criteria for demonstrating undue hardship established in this circuit by *In re Faish*, 72 F.3d 298 (3d Cir. 1995). He prosecuted his complaint *pro se*.

Defendant Educational Credit Management Corporation (ECMC)[1] opposes plaintiff's requested relief. It maintains that Mr. Jones has been and could be gainfully employed if he so chose, and that he could repay some or all of his student loans in the future. ECMC also asserts that Mr. Jones has acted in bad faith because he has never tendered any student loan payments, has not taken advantage of the

---

**1.** ECMC's motion to substitute itself for defendants American Education Services and Philadelphia Higher Education Assistance Agency was granted by order of this court on April 23, 2008.

Income Contingent Repayment Plan, has discharged student loans through a prior bankruptcy case, and has filed the instant bankruptcy petition just after expiration of an extended repayment forbearance period, while fully employed, and without making any effort to commence repayment of his student loans.

A one-day trial took place. Upon consideration of the testimony and documents offered in evidence, I make the following factual findings.[2]

## I.

### A.

On August 16, 2006, Mr. Jones filed a voluntary bankruptcy petition under Chapter 7 of the Bankruptcy Code. This is his second chapter 7 filing. His earlier case commenced on June 22, 1993 and was docketed at Bankr. No. 93–13727. During that prior bankruptcy Mr. Jones discharged student loans obligations held by: Rutgers, The State University of New Jersey, Adv. Proc. No. 93–0720; Department of Veterans Affairs, Adv. Proc. No. 93–0721; New Jersey Higher Education Assistance Agency, Adv. Proc. No. 93–0722; and Morehouse College, Adv. Proc. No. 93–0723.

Mr. Jones currently resides at 4609 Blakiston Street, Philadelphia, Pennsylvania. *See* ex. D–1. At the time of trial, Mr. Jones was 52 years old. N.T. at 10:51.[3] Mr. Jones is single, lives alone, and has no dependants. N.T. at 10:52. He suffers from Type II diabetes, which he controls through diet and medication; otherwise, he is in good health. Ex. D–3, at 100. Mr. Jones has no medical conditions that would prevent him from working now or in the future. *Id.*

Defendant ECMC is a Minnesota non-profit corporation, which acts as a designated guaranty agency pursuant to the Higher Education Act of 1965, as amended, 20 U.S.C. § 1077 *et seq.* ECMC provides guaranty agency services to the United States Department of Education, and also accepts bankrupt student loan accounts from other guarantor agencies. ECMC has been assigned the 18 student loans at issue in this adversary proceeding. *See generally* Ex. D–6.

Mr. Jones is a highly educated individual who has amassed numerous degrees in diverse disciplines from various institutions. His extensive educational history consists of the following:

He graduated from Columbus East High School in Columbus, Ohio in 1973. Ex. D–3, at 14. Mr. Jones did well in high school, graduating in the top third of his class. In the autumn of 1973, he began undergraduate studies at Morehouse College in Atlanta, Georgia. N.T. at 9:48; Ex. D–3, at 15–16. Mr. Jones was awarded a half-tuition scholarship to attend Morehouse College, which was conditioned upon him maintaining a 3.0 grade point average. D–3, at 15–16. His average dropped to 2.8 for a period of time and he lost the half-tuition scholarship. *Id.,* at 15. While at Morehouse, he pursued a degree in history. Ex. D–3, at 17–18. He also participated in the school's work study program. *Id.*

Mr. Jones transferred from Morehouse to Georgia State University in 1975. *Id.,* at 16; *see* ex. D–2, # 4. Mr. Jones graduated from Georgia State in 1978 with a bachelor of arts degree in history and a

---

**2.** The factual findings under Fed. R. Bankr.P. 7052 will be made in narrative format.

**3.** No party ordered a transcript of the trial. Therefore, all reference to the testimony ("N.T.") shall include the precise time of day that the testimony was given during the one-day trial, as disclosed on the audio disc.

minor in economics. Ex. D–2, # 4. He earned a 3.3 grade point average in his major and an overall grade point average of 3.19. Ex. D–3, at 17–18. He also made the Dean's List several semesters. *Id.* While Mr. Jones attended Georgia State University, he participated in the University's R.O.T.C. program. *Id.,* at 20–21. Participation in the program required Mr. Jones to serve in the United States Army. *Id.* Ordinarily his commitment to serve would have commenced upon his graduation from Georgia State in 1978. However, Mr. Jones's entry into the army was deferred for a period of three years because he gained admission to law school upon his graduation from Georgia State. *Id.,* at 20; ex. D–2, # 4.

Mr. Jones enrolled at Rutgers (Newark), a State University of New Jersey Law School, in 1978. Exs. D–3 at 20; D–2, # 4. Mr. Jones successfully completed the three year course of study and was awarded a juris doctorate degree in 1981. Exs. D–2, # 4; D–7. He graduated with a 2.2 grade point average. Ex. D–3, at 22. Mr. Jones never became a licensed attorney, however. He sat for the bar exam on a number of occasions, but never obtained the necessary minimum score for admission to the bar. N.T. at 9:50–51.

In 1995, Mr. Jones enrolled at the University of the Arts in Philadelphia, Pennsylvania. Ex. D–2, # 4. He graduated in 1998 with a master's degree in teaching the visual arts. *Id.*

In 1999, Mr. Jones enrolled in the Lutheran Theological Seminary at Philadelphia as a part-time student. Ex. D–2, # 4; N.T. at 9:57. He completed the program and graduated with a master's degree in divinity in 2005. Ex. D–3, at 30. Mr. Jones expressed interest in pursuing a doctoral degree in divinity; however, he was not eligible to receive additional financial aid through the school. N.T. at 9:57.

Thus, Mr. Jones holds a bachelor of arts degree in history, with a minor in economics, as well as a juris doctorate, and two master's degrees-one in teaching the visual arts and the other in divinity.

## B.

Mr. Jones's employment history is as varied as his educational background, as he has worked in different fields, both while attending school and after. He has also experienced frequent and extended periods of unemployment.

As part of the work study program at Morehouse College, Mr. Jones worked as a research assistant, and during the summer months, he worked at United Parcel Service. Ex. D–3, at 35–36. While he was attending Georgia State University, Mr. Jones worked as a parking attendant for Parking Company of America. *Id.* And, during law school, Mr. Jones spent one summer working for the U.S. Department of Labor on ERISA matters, and another summer with the legal advisor for the City of Atlanta. *Id.,* at 24. Despite earning his juris doctorate, Mr. Jones has never worked in a private law firm, nor did he pursue law related employment after law school. *Id.*

As previously noted, Mr. Jones was commissioned into the United States Army while he participated in Georgia State University's R.O.T.C. program. N.T. at 9:59–10:00. After he graduated from Rutgers School of Law, in 1982, Mr. Jones began serving as a lieutenant in the Army. N.T. at 10:00. His term of service was three years, 1982–1985. N.T. at 10:00. He was an air defense artillery officer, N.T. at 10:01, completing a Guided Missile Officer Training Course in 1982. Ex. D–2, # 4. In the Army, Mr. Jones held a leadership position wherein he was responsible for supervising a platoon of soldiers made up

of approximately 21 persons. *Id.* at 10:02. Mr. Jones was honorably discharged in 1985. Exs. D–2, # 4; D–3, at 25. Nonetheless, Mr. Jones testified that he had some minor disciplinary issues in the Army, and received an Article 15 nonjudicial punishment. He acknowledged, however, that he could have continued serving in the Army had he desired to do so. *Id.,* at 37–38, N.T. at 10:03. While serving in the Army, Mr. Jones earned approximately $24,000 per year. Complaint, at ¶ 8.

After his Army discharge in 1985, Mr. Jones began working as a per diem substitute teacher for the School District of Philadelphia. Exs. D–2, # 5; D–3, at 44. Mr. Jones worked as a substitute teacher until 2000, when he was offered a position with the Philadelphia School District as a full-time art teacher. Exs. D–2, # 5; D–3, at 45. When Mr. Jones started substitute teaching he earned approximately $55 per day. This amount increased over time, and when he ceased substituting in 2000 he was earning between $100 and $120 per day. Exs. D–2, # 5; D–3, at 45.

From February 1986 through 1991, substitute teaching was Mr. Jones's sole employment. *See* Ex. D–2, # 23. Mr. Jones opined that he had difficulty obtaining a full-time teaching position because he was relying predominately on his law degree as a stepping stone into education, and he did not have a degree in teaching or any other formal teaching certification. N.T. at 10:05. During the summer months of those years (when the Philadelphia public schools were not in session), Mr. Jones received welfare, including food stamps. *See* N.T. at 10:08; ex. D–2, # 23. During one summer in 1988, Mr. Jones was able to find additional work as a lifeguard at the Pennsylvania Institute, a mental hospital; however, he was terminated from that employment. Ex. D–2, # 23. There was no testimony or other evidence reflecting whether Mr. Jones actively sought employment in the private sector during this time frame.

In December 1991, Mr. Jones began work as a Social Worker Trainee for the City of Philadelphia. *Id.* Mr. Jones was terminated from this position in June 1992. *Id.* His salary was $20,000 per year. *Id.*

From August of 1993, until he was terminated in January 1995, Mr. Jones worked as an Income Maintenance Caseworker for the Commonwealth of Pennsylvania. *Id.* His salary was $25,000 per year while in this position. *Id.*

As discussed above, Mr. Jones began classes at the University of the Arts in 1995. Mr. Jones attended classes part-time and continued to work as a substitute teacher during this time frame. He maintained his position as a substitute teacher through the year 2000.

No later than 1987, Mr. Jones began writing poetry, short-stories, political essays, a novel and a theatrical play, and created a collection of photographs of his trip to Africa. He lists about two dozen such artistic efforts as part of his personal property on his bankruptcy Schedule B. But other than an occasional prize, these creative endeavors have not provided Mr. Jones with commercial success.

In 1996, while attending the University of the Arts, Mr. Jones was evicted from his apartment in West Philadelphia. Mr. Jones moved into 1215 Bainbridge Street, a homeless shelter operated by a private contractor for the City of Philadelphia's Office of Shelter for Homeless Adults. Ex. D–2, # 23. Mr. Jones remained at the shelter for one month, and then was reassigned to a shelter at Food for Life, which operated a shelter and program for homeless veterans. *Id.* After a brief stay in a one room barracks-style shelter, Mr. Jones

was provided with a single room occupancy, *i.e.*, a small one-person apartment, at which he stayed for two years. *Id.* At the end of that two year period, the shelter at Food for Life was closed, and Mr. Jones was moved to Reed House, located at 39th and Reed Street in South Philadelphia. *Id.* Mr. Jones was provided with a single room occupancy apartment operated by the Salvation Army, a Section 8 subsidized dwelling. *Id.* Mr. Jones stayed at Reed House until 2002, when he was eligible to receive a voucher from PHA and the Section 8 program, and relocated to his current address, which is also Section 8 housing.

In September 2000, Mr. Jones obtained a full time art teacher position with the Philadelphia public school system. Mr. Jones maintained this position for a full year, until September 11, 2001, when he was terminated. Ex. D-3, at 46. While he was trying to maintain discipline in the classroom, he grabbed a child and physically pulled him over to a corner to sit. *Id.* Mr. Jones was no longer able to teach full time, or substitute teach, in the Philadelphia public school system after that incident. *Id.*, at 46–47. Mr. Jones earned between $25,000 and $28,000 during the year he was a full time art teacher. *Id.* at 45–46.

Mr. Jones attended Lutheran Theological Seminary in the years between 1998 and 2005. Even though this was a part time program, Mr. Jones did not engage in any type of employment between September 2001 and 2003. He lived in a Section 8 apartment, ex. D-3, at 48–49, and, because he was unemployed, paid no rent. *Id.* Mr. Jones was eligible for food stamps during this period, and he supported himself with whatever monies remained, after

payment of tuition and expenses for school, from his student loan disbursements. *Id.*

Mr. Jones was unemployed from September 12, 2001 through the spring of 2003. His income for 2002 was $0. Ex. D-4. During the summer of 2003, Mr. Jones worked for Fort Wayne Urban Ministries as a seminarian. Ex. D-2, # 5. Presumably he procured this employment through the Lutheran Theological Seminary. Mr. Jones earned $3,500 that summer—which sum represents his total earnings for 2003. *Id.*; ex. D-4. Mr. Jones was unemployed throughout 2004, again earning $0 for that year. Ex. D-4. From September 2005 to January 2006 Mr. Jones worked at Hancock St. Johns Ministry UMC. D-2, # 5. He earned $80 per week as a group leader. *Id.* His total earnings for 2005 were $1,791. *See* D-4.

On April 17, 2006, Mr. Jones commenced working for the Pennsylvania Department of Corrections as a corrections officer at Graterford prison. His primary responsibilities included the care, custody, and control of inmates. N.T. at 10:12–13. He held this position until February 2008. Mr. Jones was making $32,000 per year in this position.

Mr. Jones voluntarily terminated his employment with the Department of Corrections because his car, a 2006 Suzuki Forenza, which he purchased new, was repossessed on February 16, 2008 due to non-payment.[4] After the vehicle was repossessed, Mr. Jones decided that he had no alternative means of transportation to get him to and from work. N.T. at 10:23.

The prison at which he was employed is located 34 miles away from Mr. Jones's home in Philadelphia. *Id.* Mr. Jones believed that he had no choice but to quit his

---

**4.** By order dated February 4, 2008, I granted AmeriCredit Financial Services' motion for relief from the automatic stay.

job. He acknowledged, however, that he did not discuss alternatives to quitting with his employer, such as rescheduling his duties to coincide with those of co-workers living near him, if any, with whom he could commute to work from Philadelphia, nor working any alternative shifts for which public transportation may have been possible. N.T. at 10:27–29. Furthermore, Mr. Jones did not seek to relocate his residence nearer to Graterford after his automobile was repossessed. He believed it would be difficult to find rent subsidized Section 8 housing near Graterford. N.T. at 10:24.

As of the date of trial in this adversary proceeding, Mr. Jones had been unemployed for approximately four months. He acknowledged that he had passed the Parole Agent I examination while being employed as a corrections officer. *See* Ex. D–2, # 23. He had interviewed for a position as a parole agent and for a position with the professional management association for the Commonwealth of Pennsylvania, without receiving an offer of employment. N.T. at 10:30. There was no evidence that Mr. Jones has applied for other positions in addition to the two cited above. Nor is it clear that his applications for these positions were made after he terminated his employment at Graterford.

## C.

The 18 student loan obligations that Mr. Jones now seeks to discharge were incurred while attending the University of the Arts and the Lutheran Theological Seminary. Exs. D–3, at 51–56; D–6; N.T.

at 9:53. He incurred approximately $140,000 in student loan debt while attending these institutions.[5] Mr. Jones's student loan payment is scheduled at $1,770 per month. *See* Complaint and Answer, at ¶ 6.

## II.

Plaintiff contends that his student loan obligation should be discharged under section 523(a)(8) because it imposes an undue hardship upon him. Section 523(a)(8) states that:

> [a] discharge under section 727 ... does not discharge an individual debtor from any debt—
>
> (8) unless excepting such debt from discharge under this paragraph would impose an *undue hardship* on the debtor and the debtor's dependents, for—
>
> (A)(i) an educational benefit overpayment or loan made, insured, or guaranteed by a governmental unit, or made under any program funded in whole or in part by a governmental unit or nonprofit institution; or
>
> (ii) an obligation to repay funds received as an educational benefit, scholarship, or stipend; or
>
> (B) any other educational loan that is a qualified education loan, as defined in section 221(d)(1) of the Internal Revenue Code of 1986, incurred by a debtor who is an individual[.]

11 U.S.C. § 523(a)(8) (emphasis added). Neither party has suggested that plaintiff's debts to ECMC are anything other than educational loans made, insured or guaranteed by a governmental unit, or

---

**5.** According to Plaintiff's Schedule F, ex. D–1, plaintiff owes $138,490.46 in student loans. ECMC claims the amount is slightly higher, $143,635.12. Neither party requested that I fix the final amount due and owing on Mr. Jones's student loans; nor did the parties suggest that I have the power to discharge a

portion of the loans only. *See generally In re Allen,* 329 B.R. 544, 549–50 (Bankr.W.D.Pa. 2005). Therefore, for the purposes of this proceeding, I will assume that Mr. Jones owes approximately $140,000, and this debt is either completely dischargeable or nondischargeable.

made under a program funded in whole or in part by a governmental unit or non-profit institution. Thus, the obligations are presumptively nondischargeable pursuant to 11 U.S.C. § 523(a)(8). In drafting this exception to discharge,

> Congress sought principally to protect government entities and nonprofit institutions of higher education—places which lend money or guarantee loans to individuals for educational purposes—[as well as entities who guarantee such loans] from bankruptcy discharge. Because such loans are not based upon a borrower's proven credit-worthiness, and because they serve a purpose which Congress sought to encourage, section 523(a)(8) protects the lender when a borrower, who often would not qualify under traditional underwriting standards, files a chapter 7 bankruptcy.

*In re Segal*, 57 F.3d 342, 348 (3d Cir.1995).

The Third Circuit has adopted the three-prong test for determining "undue hardship" articulated in *Brunner v. New York State Higher Education Services Corp.*, 831 F.2d 395 (2d Cir.1987). *In re Faish*, 72 F.3d 298 (3d Cir.1995). In order to demonstrate undue hardship, the chapter 7 debtor must demonstrate:

> (1) that the debtor cannot maintain, based on current income and expenses, a "minimal" standard of living for herself and her dependents if forced to repay the loans;
>
> (2) that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period for student loans; and
>
> (3) that the debtor has made good faith efforts to repay the loans.

*In re Faish*, 72 F.3d, at 304–305; *see also Pelliccia v. United States Dept. of Education*, 67 Fed.Appx. 88, 90 (3d Cir.2003) (non-precedential). The chapter 7 debtor has the burden of proving each prong of the test by a preponderance of the evidence. *See In re Brightful*, 267 F.3d 324, 327–28 (3d Cir.2001); *Sperrazza v. University of Maryland*, 2008 WL 818616, at *2 (E.D.Pa.2008); *see generally Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991). If the debtor fails to prove any prong, the student loans cannot be discharged. *See In re Brightful*, 267 F.3d at 327–328; *Sperrazza v. University of Maryland*, 2008 WL 818616, at *2.

This three-part test is dispositive: A bankruptcy court may not consider equitable concerns or other factors not contemplated by the three factors in its undue hardship analysis. *In re Brightful*, 267 F.3d at 327–28; *Sperrazza v. University of Maryland*, 2008 WL 818616, at *2.

By way of further explication of these three factors, the Third Circuit in *Faish* noted:

> "[t]he first prong of *Brunner* requires an examination of the debtor's current financial condition to see if payment of the [student] loans would cause his standard of living to fall below that minimally necessary."

> \* \* \*

> The second prong of the *Brunner* test requires "that additional circumstances exist indicating that this state of affairs is likely to persist for a significant portion of the repayment period of the student loans." *Brunner*, 831 F.2d at 396.... [T]his requirement "properly recognizes the potential continuing benefit of an education, and imputes to the meaning of 'undue hardship' a requirement that the debtor show his dire financial condition is likely to exist for a significant portion of the repayment period."

The third prong of the *Brunner* test is the good faith inquiry.... [T]he question of good faith should only be reached if the debtor has satisfied the first two elements.... The good faith inquiry is to be guided by the understanding that "undue hardship encompasses a notion that the debtor may not willfully or negligently cause his own default, but rather his condition must result from 'factors beyond his reasonable control.'"

72 F.3d, at 305 (quoting *Matter of Roberson*, 999 F.2d 1132, 1135–36 (7th Cir.1993)) (citations omitted).

■ In so defining undue hardship, the Third Circuit Court of Appeals intended to meet the following policy concerns:

The *Brunner* standard meets the practical needs of the debtor by not requiring that he or she live in abject poverty for up to seven years [6] before a student loan may be discharged. On the other hand, the *Brunner* standard safeguards the financial integrity of the student loan program by not permitting debtors who have obtained the substantial benefits of an education funded by taxpayer dollars to dismiss their obligation merely because repayment of the borrowed funds would require some major personal and financial sacrifices.

*Id.* at 305–06; *see Sperrazza v. University of Maryland*, 2008 WL 818616, at *2.

The parties in the instant adversary proceeding agree that the sole issue posed is whether repayment of the debtor's student loans would constitute an undue hardship, applying the three-part *Faish* test. I note that the undue hardship standard is difficult for an individual debtor to meet. For example, in *In re Brightful*, the Third

Circuit Court of Appeals concluded that the chapter 7 debtor—a 46–year–old single parent of a 14–year–old minor, who resided with her sister, was employed part-time earning about $8,500 per annum at the time of trial, and also had psychiatric problems—could repay her outstanding $52,000 student loan obligation without an undue hardship. 267 F.3d at 326.

In his complaint, Mr. Jones avers that his monthly student loan payment was $1,770. ECMC contends that Mr. Jones's payment could have been $400 per month while he was working as a corrections officer, and now that he is unemployed, it could be $0. The difference in monthly loan payments is based on ECMC's position that Mr. Jones is eligible for the "William D. Ford Federal Direct Loan Program." *See* 34 C.F.R. Part 685. Under this program an individual holding certain types of student loans may consolidate those loans into one direct loan. *See* 34 C.F.R. § 685.220; *see also In re Wallace*, 259 B.R. 170, 174 (C.D.Cal.2000). The borrower may then choose among different repayment options. *See* 34 C.F.R. § 685.208.

The option which ECMC emphasizes in this proceeding is the one styled the "income contingent repayment plan" or ICRP. *See* 34 C.F.R. § 685.208(k). One court summarized the salient aspects of this repayment option:

[A] borrower may qualify for an Income Contingent Repayment Plan, where the amount of the required monthly payment is recalculated yearly based on the borrower's Adjusted Gross Income, family size and the "poverty guidelines" promulgated by the United States Department of Health and Human Services. The repayment period covers a maxi-

---

**6.** An earlier version of section 523(a)(8) rendered all student loans dischargeable if they were more than 7 years old at the time of the bankruptcy filing. That provision was eliminated by Congress in 1998. *See In re Clarke,*

266 B.R. 301, 306 n. 6 (Bankr.E.D.Pa.2001). Mr. Jones was able to use this earlier version to discharge prior student loan obligations in his 1993 bankruptcy case.

mum of 300 months. The amount of payments are dependent on the borrower's income and payment may not be required at all during times when the borrower has little income. The balance remaining after the 300–month period is deemed forgiven.

*In re England,* 264 B.R. 38, 44 (Bankr.D.Idaho 2001).

To qualify for this program, an individual must formally apply, which then authorizes the IRS to release tax information to the Secretary of Education. *See In re Thomsen,* 234 B.R. 506, 509 (Bankr. D.Mont.1999). The borrower's monthly payment obligation is then determined based upon his income, with periodic reviews. *See id.* Interest on the consolidated loan accrues at a rate established in the regulations, and if the borrower's payments are insufficient to cover the accruing interest, at least some of it will be capitalized. 34 C.F.R. § 685.209. At the end of 25 years, the unpaid balance may be "discharged" by the Secretary of Education, with this discharge considered by the IRS as a taxable event. *Thomsen,* 234 B.R. at 509–10. ECMC maintains that were Mr. Jones to apply for the ICRP program he would have little or no payment obligation based upon his present financial circumstances, albeit a continuing legal obligation to repay his student loan debts if his financial circumstances improved.

### III.

### A.

■■ To establish the first prong of the *Faish* test, a chapter 7 debtor must show that he cannot maintain, based on current income and expenses, a minimal standard of living for himself and his dependents were he to repay his outstanding student loans. *Faish,* 72 F.3d at 304–05. This prong requires that the debtor show more than tight finances. *Id.* at 306. After considering the debtor's basic needs (and those of his dependents) for food, clothing, shelter, and medical treatment, one must determine whether the debtor has any additional funds available to make the necessary payments toward his student loans. *See In re Carlson,* 273 B.R. 481, 484 (Bankr.D.S.C.2001).

At present Mr. Jones has no dependents and is living in a Section 8 rent subsidized apartment. When he commenced this proceeding on June 18, 2006 (two days after he filed his bankruptcy petition), he was fully employed and had monthly net income of $1,900, based on a salary of $32,000 per year. Since quitting his job in February 2008, Mr. Jones has no income.

The debtor has the burden of proving that he cannot maintain a minimal standard of living while making payments on his student loans. Based on the evidence introduced at the hearing,[7] I will accept *arguendo* that Mr. Jones has demonstrated a present inability to make payments on his student loans because he has no income and his only means of support is public assistance. *See In re Brunner,* 46 B.R. 752, 757–58 (Bankr.S.D.N.Y.), *aff'd* 831 F.2d 395 (2d Cir.1987); *In re Holzer,* 33 B.R. 627, 631 (Bankr.S.D.N.Y.1983).

However, a present inability to maintain a minimal standard of living while paying

---

**7.** Mr. Jones presented very little evidence about his current living expenses and income. Based on his bankruptcy schedules, I can approximate his monthly expenses, which were reasonable; however, there was no evidence about the monetary value of any public assistance received by debtor. Debtor seemed to be operating under the false assumption that the court could access his records maintained by the Pennsylvania Department of Public Welfare and the United States Department of Veterans Affairs. *See* exs. P–1, P–3.

off student loans, standing alone, is insufficient to support a finding of undue hardship. Mr. Jones must also establish that additional circumstances exist that indicate he will be unable to maintain a minimal standard of living and make loan payments in the future, and that he has made good faith efforts to repay his student loans.

### B.

█ In addition to demonstrating a present inability to repay one's student loans while maintaining a minimal standard of living, the *Faish* test requires that the debtor demonstrate that this dire financial condition will persist for a significant portion of the loan repayment period for reasons not within the debtor's control. *See In re Brightful,* 267 F.3d at 328. Dischargeability should be based on "certainty of hopelessness, not simply a present inability to fulfill financial commitment." *Id.* (quoting *In re Brunner,* 46 B.R. at 755). Undue hardship "is reserved for the exceptional case and requires the presence of 'unique' or 'extraordinary' circumstances which would render it unlikely that the debtor ever would be able to honor his obligations." *In re Ballard,* 60 B.R. 673, 675 (Bankr.W.D.Va.1986). Typically, the set of circumstances that justify a finding of undue hardship under the second prong of the test are long-term physical or mental problems precluding employment, lack of marketable job skills, or the necessity of fully supporting several dependents which precludes sufficient income. *See generally In re Roberson,* 999 F.2d 1132, 1137 (7th Cir.1993) (and cases cited therein).

As noted earlier, in *In re Brightful* the Third Circuit held that the 46–year–old part-time legal secretary, raising her 14–year–old child and living with her sister, and who had psychiatric problems and had twice attempted suicide, did not present sufficient evidence that she could not obtain full-time secretarial employment in the future and thus failed to meet the second *Faish* test. In this adversary proceeding, I am not persuaded by Mr. Jones's position that, considering his educational background, employment history and age, he will be unable to make any meaningful student loan payments in the future.

█ Mr. Jones is a relatively healthy, 52–year–old individual with no dependents. He has no medical or psychiatric condition that prevents him from employment. Although he is presently unemployed, he has not demonstrated that he has made diligent efforts to secure stable employment now or in the past. *See In re Greco,* 251 B.R. 670, 677 (Bankr.E.D.Pa.2000). His present employment situation does not exist because he is unemployable. On the contrary, Mr. Jones is a highly educated individual who has marketable skills in a variety of areas: *e.g.,* legal, managerial, correctional, religious, literary and artistic.

A review of the debtor's employment and educational history reveals that Mr. Jones has made certain choices that, in the aggregate, have made his financial position more precarious than it might otherwise have been. For example, between 2002 and 2005 the only employment Mr. Jones sought was connected to obtaining his master's degree in divinity, even though the pay was extremely small and his educational program was only part-time. Mr. Jones could have sought out more lucrative employment in order to support himself, but he chose not to do so. Instead, Mr. Jones elected to pay his living expenses from the proceeds of student loans, which was possible because Mr. Jones was also receiving governmental assistance for his food and rent expenses.

█ Furthermore, Mr. Jones may need to investigate employment opportunities outside of the public sector in order to

secure stable gainful employment in the future. I observe that throughout his work history, Mr. Jones generally has pursued governmental employment of one type or another. Since graduating from college, it appears that Mr. Jones has rarely sought any type of employment in the private sector. At the hearing, Mr. Jones expressed interest in becoming a parole agent for the Commonwealth of Pennsylvania. If positions in Mr. Jones's chosen field are unavailable, then the *Faish* test requires that he must seek employment opportunities in other fields. *See Greco,* 251 B.R. at 677; *In re Vinci,* 232 B.R. 644, 652–53 (Bankr.E.D.Pa.1999) ("Borrowers under the various guaranteed student loan programs are obligated to repay their loans even if they are unable to obtain employment in their chosen field of study."). *See also In re Oyler,* 397 F.3d 382, 386 (6th Cir.2005):

> Oyler's choice to work as a pastor of a small start-up church cannot excuse his failure to supplement his income so that he can meet knowingly and voluntarily incurred financial obligations. By education and experience he qualifies for higher-paying work and is obliged to seek work that would allow debt repayment before he can claim undue hardship. *See In re Storey,* 312 B.R. at 872 (debtor must do everything in his power to improve financial situation); *In re Kraft,* 161 B.R. at 86–87 (debtor needed to look for all job opportunities before claiming undue hardship).

Mr. Jones has affirmatively chosen to sustain long periods of unemployment so that he could obtain additional education. Having received that education, Mr. Jones is now obligated to look at all viable career alternatives to repay his loans.

Mr. Jones contends that his age prevents him from making any substantial payments on his student loans in the future by precluding meaningful full-time employment. I find this argument unpersuasive. Mr. Jones is a highly-educated intelligent, and employable individual. With some effort and flexibility, it is likely that he can find full-time, gainful employment.

Moreover, Mr. Jones had already earned a bachelor's degree and juris doctorate degree before he enrolled in the master's degree program at University of the Arts in 1995, where the student loans at issue were initially incurred. At that time, he was approximately 40 years of age, his first bankruptcy case was completed and his undergraduate and law school student loans had been fully discharged by his 1993 bankruptcy filing. Mr. Jones was the recipient of a "fresh start" and he chose to embark, educationally and professionally, into new arenas. Mr. Jones may not now complain that age alone will prevent him from paying back his student loans. *See Jones v. Bank One Texas,* 376 B.R. 130, 139 (W.D.Tex.2007) ("Debtor cannot now use her age as grounds to avoid repaying her student loans as she chose to go to school later in life, which resulted in the student loan debts persisting into her later age."); *Educational Credit Management Corp. v. Spence,* 341 B.R. 825, 828–29 (E.D.Va.2006) (holding that student loans are not dischargeable under second prong of *Brunner* test even though debtor is in her sixties and her loan debt is more than $160,000).

In sum, Mr. Jones has failed to illustrate the sort of financial hopelessness that is necessary before student loans may be discharged. On the contrary, many of Mr, Jones's present financial problems stem from restrictive choices he has made. Mr. Jones chose to obtain additional higher education later in life, the result of which was substantial student loan debt. While attending part-time programs, Mr. Jones

failed to work on any consistent, long term basis. Instead, he chose to use his student loan proceeds and public assistance to pay his expenses. Lastly, Mr. Jones has not fully investigated all viable career paths, and he has not done enough to ensure that he remains employed once he procures a suitable position. Therefore, I find that he has failed to sustain his burden of demonstrating the second prong of the *Faish* test.

### C.

The third prong of the *Faish* test requires that the debtor demonstrate that he has made good faith efforts to repay his student loans. *Faish,* 72 F.3d at 305. Fundamental to the good faith inquiry is the notion that the debtor did not willfully or negligently cause his own default, but that his condition results from factors beyond his control. *Id.* A debtor's good faith may be measured by his efforts to obtain employment, maximize income, and minimize expenses. *In re Mason,* 464 F.3d 878, 884 (9th Cir.2006). In making this determination, the Third Circuit has noted two non-exclusive factors bankruptcy courts should consider: "(1) whether the debtor incurred substantial expenses beyond those required to pay for basic necessities and (2) whether the debtor made efforts to restructure his loan before filing his petition in bankruptcy." *Pelliccia v. U.S. Dep't of Educ.,* 67 Fed.Appx. at 91; *see also In re Pena,* 155 F.3d 1108, 1114 (9th Cir.1998) (debtors acted in good faith where (1) they made some payments on their loans and (2) although they purchased a car, it was a 20–year–old car); *In re Cheesman,* 25 F.3d 356, 360 (6th Cir. 1994) (debtors acted in good faith where (1) they made minimal payments on their loans for several years and (2) chose to work in worthwhile professions even though they were low-paying); *Brunner,* 831 F.2d at 397 (debtor failed to demonstrate good faith when she filed a bankruptcy petition shortly after her student loan payments first became due, and never requested a payment deferment).

Even though Mr. Jones has maintained relatively modest monthly expenses, he has failed to conscientiously strive to maximize his income. As of the date of the hearing, Mr. Jones was unemployed. Mr. Jones has been unemployed, in the aggregate, for roughly four of the last eight years. Between 2002 and 2005, it is not clear that Mr. Jones actively sought any employment outside of what his master's degree program in divinity required. When a debtor has not actively sought employment for a substantial period and is not precluded from doing so by reasons of health or other circumstances, it is difficult for that debtor to demonstrate the requisite good faith effort to repay his student loans as required by the third prong of the Faish test. *See Mason,* 464 F.3d at 885.

Although not dispositive, the evidence at the hearing demonstrated that Mr. Jones declined any effort to restructure his loans before seeking to have them discharged in bankruptcy. Defendant ECMC contends that because the debtor would be eligible for the ICRP, and because his monthly payments would be nominal, debtor cannot demonstrate the requisite good faith required by the third prong of the *Faish* test.

The ICRP is but one factor to be considered in determining undue hardship; participation in the program is not a prerequisite to dischargeability under section 523(a)(8). *See, e.g., In re Durrani,* 311 B.R. 496, 506 (Bankr.N.D.Ill.2004); *In re Furrow,* 2004 WL 2238536, at *3 (Bankr. W.D.Mo.2004); *In re Strand,* 298 B.R. 367, 376 (Bankr.D.Minn.2003); *In re Newman,* 304 B.R. 188, 195 (Bankr.E.D.Pa.2002); *see generally In re Ford,* 269 B.R. 673, 677 (8th Cir. BAP 2001).

In addition, Mr. Jones has never made any loan payments on the 18 loans he now seeks to discharge. Upon graduation from the Lutheran Theological Society, the debtor requested and was granted a forbearance on repaying his student loans. When his forbearance expired and his request for an additional forbearance was rejected, Mr. Jones filed his bankruptcy petition and immediately commenced the present adversary proceeding. When this proceeding started, the debtor was employed and earning a salary of $32,000 per year.

The timing of his bankruptcy filing and instant adversary proceeding undermines to some degree Mr. Jones's position that he has acted in good faith to repay his student loans. When he filed this lawsuit, Mr. Jones was still employed by the Department of Corrections. Yet, he never tendered even partial payments toward his student loan obligations; nor did he seek to reduce his monthly payments to an amount related to his net income. Moreover, had he continued his employment with the Department of Corrections, one might expect his income to increase, resulting in an ability to pay off his student loans over time. *See also In re Zibura*, 128 B.R. 129, 133 (Bankr.W.D.Pa.1991) ("There is ample reason to believe that Mr. Zibura's future financial condition will improve and that he will be able to pay his student loans without undue hardship. His pessimistic testimony that his salary will not increase in future years is not credible. Mr. Zibura has marketable skills. Moreover, he began his new career as a licensed occupational therapy assistant only a short time ago. He can reasonably expect to receive future promotions with commensurate increases in salary.").

Furthermore, Mr. Jones has not demonstrated a sincere effort to maintain gainful employment upon graduation from the seminary. Mr. Jones was employed with the Pennsylvania Department of Corrections when he filed his bankruptcy petition. He quit this position when his car was repossessed. It is not clear why Mr. Jones ceased making payments on his car—his bankruptcy schedules suggest that he had funds sufficient to keep the payments current. Moreover, if the car was too expensive, as Mr. Jones believes, he offered no evidence of good-faith efforts to obtain a less expensive vehicle; nor did he offer evidence of good-faith efforts to maintain employment without an automobile: *i.e.,* car pooling with co-workers; readjusting his work schedule; relocating his residence.

Considering all of the evidence, I conclude that Mr. Jones failed to meet his evidentiary burden on the issue of good faith.

### IV.

In summary, after reviewing the testimony and the documentary evidence offered at trial, I conclude that Mr. Jones has not demonstrated by a preponderance of the evidence that repaying his student loans imposes an undue hardship upon him pursuant to 11 U.S.C. § 523(a)(8). Mr. Jones has failed to meet two of the three components demonstrating undue hardship adopted by the Third Circuit in *In re Faish*, 72 F.3d 298 (3d Cir.1995). He is a highly-educated, talented, articulate individual without any serious medical condition that would preclude employment. As Congress has now strictly limited discharging student loans, he is obligated to make a greater effort to repay these obligations.

An appropriate order shall be entered.